KEMP, Plaintiff in error, v. STATE, Defendant in error.

*No. State 138. Argued October 2, 1973.—Decided*
*November 12, 1973.*
(Also reported in 211 N. W. 2d 793.)

For the plaintiff in error there was a brief by *Charles J. Herro* and *Herro, Snyder, Chapman & Snyder,* all of Oconomowoc, and oral argument by *Charles J. Herro.*

For the defendant in error the cause was argued by *Steven B. Wickland,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

BEILFUSS, J. As to the finding of guilt on the principal charge upon review here, the defendant asserts: (1) It was error to find the defendant guilty upon the basis of the record of the preliminary examination, (2) that evidence is not sufficient to sustain the conviction, and (3) that the trial court had a duty to consider lesser included crimes.

On June 15, 1971, the body of Diane Kemp, the defendant's wife, was found in the bed in a bedroom of their apartment in a badly decomposed state, with two bullet holes in her back. At the autopsy, two .22-caliber bullets were removed from the body. One had gone through her heart and caused the death.

On the same day, June 15th, the police received a call from the Veterans Administration Hospital at Wood, Wisconsin, advising them that the defendant voluntarily came there, that he was drinking and armed, and that he had his two children with him. The police found the defendant there with a partially empty liquor bottle and armed with a .22-caliber pistol tucked in his belt. He

was informed of his wife's death and he claimed no recollection of all or most of the events of the past four days. The police disarmed him and arrested him for the murder of his wife. It was subsequently determined by a ballistic expert that the two bullets taken from Mrs. Kemp's body were fired by the pistol taken from the defendant.

Shortly after the arrest the police had the defendant committed to a Waukesha hospital for a five-day temporary detention for the purpose of a mental observation.

After this period of temporary detention the defendant was brought before the county court of Waukesha county. The county court ordered that he be confined to Central State Hospital at Waupun for examination and report as to his competency to stand trial. He was found to be mentally competent to stand trial and a preliminary examination was scheduled. After an extensive preliminary examination the county judge found there was probable cause to believe the defendant had committed the crime charged and ordered him bound over to the trial court for trial.

We find no error on the part of the trial court in using the record of the preliminary examination to determine the guilt or innocence of the defendant.

Throughout the entire proceedings the defendant was represented by competent counsel. After a thorough and extensive preliminary examination and arraignment, the defendant, with the consent and advice of counsel, sought to withdraw his plea of not guilty and enter a plea of guilty to the principal charge and then have a determination of his mental responsibility. After being advised as to the nature of the facts, the defense of insanity and the finding he was competent to stand trial, the trial court refused to allow him to withdraw his plea of not guilty. The district attorney, the defense counsel, and

the defendant personally stipulated and requested the court to make the determination of guilt or innocence from the record of the preliminary examination.

An examination of the record reveals that the trial judge, WILLIAM E. GRAMLING, very carefully and thoroughly explained to the defendant all of his rights, including the right and importance of a jury trial and the effect of a waiver. The defendant had an eleventh grade education and was of a high or over-average intelligence. The trial court told the defendant that if the judge found him guilty and the jury found he was mentally responsible he would be sentenced to life imprisonment.

The defendant responded that he was aware of this. He was further advised that if there was a finding of guilt it would have to be beyond a reasonable doubt. The defendant further knowingly waived the right to present any evidence on his own behalf beyond what might appear from the preliminary examination. Before the trial court consented to make the determination from the preliminary examination, it directed that a copy of the examination be given to the defendant with directions that he read it carefully. An adjournment was had for this purpose and the defendant read it. He was again given extensive advice and admonitions as to his procedural rights and the defendant's counsel stated he had repeatedly gone over the entire matter and that the defendant fully understood his rights. The trial court then consented to make the determination from the preliminary examination and the arguments of counsel.

Up until this point the trial court had intentionally refrained from reading the preliminary examination. After reading it and hearing arguments of counsel, the trial judge found the defendant guilty of first-degree murder beyond reasonable doubt.

The purpose of a preliminary examination is not to find guilt or innocence beyond reasonable doubt but to determine whether there is probable cause to believe a felony has been committed and that the defendant committed it. It does not follow that it cannot be used to determine guilt or innocence if the parties so stipulate and the judge agrees to use the evidence in that record as the sole evidence in the case from which to determine guilt or innocence beyond reasonable doubt.

In this instance the preliminary examination was extensive and the defendant was permitted to call witnesses in his own behalf if he so chose. This record was adequate for the trial court to make the finding, which it did.

We believe the evidence as it appears in the preliminary examination, and the permissible reasonable inferences that can be drawn from this evidence, are sufficient to sustain the fact finder's (in this case the trial judge) finding that the defendant had committed the crime of first-degree murder.[1]

The defendant's principal contention as to the sufficiency of the evidence is that the proof falls short of showing an intent to kill.

In addition to the facts set forth above, the evidence before the court at this stage of the proceedings reveals the following:

The defendant and the deceased were married and lived together in an apartment in Waukesha. On June 10, 1971, the defendant consulted with a doctor at the Veterans Administration Hospital. His wife had been with him and they both returned to the apartment. On June 11th the defendant took the two children and flew to California, drank excessively while there, and returned to the Waukesha-Milwaukee area on June 14th.

[1] *Taylor v. State* (1972), 55 Wis. 2d 168, 176, 197 N. W. 2d 805.

He did not go to the apartment but registered at a motel in the area and on June 15th returned to the Veterans Administration Hospital with the children. He had been drinking and had a .22-caliber pistol with him. He was interviewed there by the police, he appeared to be confused and somewhat intoxicated and refused to voluntarily give up the gun. During the interview he stated he had no recollection of anything that transpired from the time he left the Veterans Hospital on June 10th, except that he realized at one interval that he was in California with the children and had the gun with him. When he was informed of the death of his wife he appeared emotionally upset but made no denials of his involvement nor explanations of his sudden departure with the children and without his wife. It was established by ballistics experts that the gun the defendant had with him was the one that fired the bullets recovered from his wife's body. The body was found in bed in their apartment—decomposed and odorous. The apartment was in disarray, with empty liquor bottles in the kitchen area. There was no evidence that anyone had entered or left the apartment for several days; the body was discovered by persons living in the same building and the landlord because of the offensive odor.

The evidence is circumstantial but sufficient to permit a belief beyond reasonable doubt that the defendant shot and killed his wife. An actor is presumed to intend the natural and probable consequences of his acts. The deceased was shot not once but twice in the back in a vital area. This, combined with the other facts, is sufficient to sustain the finding that the defendant fatally shot his wife and intended to kill her.

The defendant also contends it was error not to consider lesser included crimes because of the meager evidence of intent. The finding of guilt was made by the court and not a jury. If a jury had heard this evidence,

upon request, it would have been the duty of the trial court to submit instructions and alternative verdicts of lesser included crimes. However, here the trial judge was experienced and knowledgeable in the trial of criminal cases and the law of lesser included crimes. He did consider the evidence and did find the defendant was guilty of first-degree murder. We have concluded the evidence is sufficient to sustain that finding and that there was no error in not discussing lesser included crimes.

On July 5, 1972, a jury was impaneled to hear and decide the issue of the defendant's mental responsibility.[2]

The jury was informed that the defendant had been found guilty of the murder of his wife. It then heard the testimony of several witnesses, including six psychiatrists, as to the historical, examinational and diagnostic facts relevant to his mental condition, and the opinions of the psychiatrists as to his mental responsibility.

The defendant, as a boy, grew up in Milwaukee. Although above average intelligence, he did poorly in school, was truant a great deal and did not get along well at home.

He left home when he was eleven or twelve years old and worked on farms near Waukesha. In 1964, the county court of Waukesha county referred him to a mental health clinic. Shortly thereafter he enlisted in the Army. He was in service in Germany and, upon his

---

[2] "971.15 **Mental responsibility of defendant.** (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

"(2) . . .

"(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence."

request, was assigned to duty in Viet Nam. While there he was engaged in some very dangerous patrol duty. On one occasion, while on patrol, a land mine exploded and killed his commanding officer and several companions. He, at that time, developed what one psychiatrist described as battle fatigue and battle neurosis. He began to drink liquor excessively, experienced amnesia and had recurring dreams of war conflicts with the Vietcong. Soon thereafter he was discharged from service. He lived a part of the time after his discharge in California with his wife and children and part of the time in Waukesha. From 1967 to June 10, 1971, he was intermittently both an inpatient and an outpatient in Veterans Administration hospitals for treatment of his mental and emotional problems. He complained of amnesia, recurring dreams of Viet Nam violence, suspicion and hostility of others, alcoholism and drug use. During this period, while at home, he armed himself with as many as four guns—he was convicted of carrying concealed weapons—and slept with one under his pillow for his claimed self-protection. In addition to his own statements that he got along well with his wife, several neighbors, who were in a position to observe, testified the family got along very well with no obvious fights or quarreling. From February 1, 1971, to May 5, 1971, he was confined to the Veterans Administration Hospital for treatment for his mental problems and from May 5th to June 10, 1971, on outpatient status. On June 10, 1971, he was released from the outpatient status to make it "on his own," but was given his doctor's private telephone number to contact if he experienced further difficulties. In his interviews with several of the psychiatrists he explained the death of his wife by saying he was sleeping and had a dream that he was in Viet Nam and being attacked by the Vietcong, that he killed some of them, that the shots woke him and that his wife was in bed with him.

Six psychiatrists testified at the trial—Dr. Fosdal for the defendant, Dr. Otto and Dr. Altmeyer as court-appointed experts, and Dr. Leben, Dr. Holbrook and Dr. Cahill for the state. All were qualified and permitted to testify as to their opinions. Dr. Fosdal, on behalf of the defendant, and Dr. Cahill, on behalf of the state, testified at length; they both had access to all of the hospital and court records, in addition to their examination interviews with the defendant.

Dr. Fosdal and the court-appointed psychiatrists all testified that at the time of the offense, as a result of mental disease or defect, the defendant lacked substantial capacity to either appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Dr. Leben and Dr. Holbrook, on behalf of the state, would not express an opinion. Dr. Cahill, called on behalf of the state, testified that he could not give an opinion as to whether the defendant was psychotic or suffering from psychosis at the time of the offense. He did testify that defendant may have lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of the law, and that it was conceivable that the defendant was legally insane at the time of the offense. Dr. Cahill, however, further testified that he had seen the information available to the other psychiatrists and that he did not believe any other psychiatrist could state with certainty what the state of the defendant's mind was at the time of the incident. He stated that because of so many variables any opinion would be speculative and a guess. The variables he identified were the extent and effect of intoxication and whether a marital spat preceded the fatal event. The only basis for believing there was a variable in the history as to a marital spat is that in one medical interview, when discussing his wife's death, the defendant stated in effect that he was better off now. This is in

contrast to several other statements that he got along well with his wife and she was the only one who understood him. In addition, several persons who knew the defendant and his wife said they got along well. There is no evidence of any family quarrel on the day in question. Based upon this evidence, to conclude there may have been some sort of quarrel or marital spat before the shooting is sheer speculation on the part of Dr. Cahill.

The defendant claims it was prejudicial error to allow Dr. Cahill to express his opinion as to the inability of any other psychiatrist to form an opinion as to the legal sanity of the defendant by virtue of sec. 971.16 (4), Stats.[3] The credibility of an expert witness and the weight the jury is going to give to his testimony, as contrasted to other witnesses, is always an issue that is properly before the jury. It is probable that the most effective method available to challenge the credibility of an expert witness and the weight of his testimony is through another expert. We do not believe this section was intended to prevent this type of testimony.

The defendant has asserted other procedural errors. We have reviewed them and find no error.

The defendant contends that he should be granted a new trial in the interest of justice under sec. 251.09,

[3] "When a physician or other expert who has examined the defendant testifies concerning his mental condition, he shall be permitted to make a statement as to the nature of his examination, his diagnosis of the mental condition of the defendant at the time of the commission of the offense charged, and his opinion as to the ability of the defendant to appreciate the wrongfulness of his conduct or to conform to the requirements of law. He shall be permitted to make an explanation reasonably serving to clarify his diagnosis and opinion and may be cross-examined as to any matter bearing on his competency or credibility or the validity of his diagnosis or opinion."

Stats.[4] While admittedly a close question, the majority of this court concludes that it appears from the record it is probable that justice has miscarried and that in our discretion a new trial should be granted to the defendant in the interest of justice.

The reason we say it is a close question is because the burden of proving by the greater weight of the credible evidence that he lacked mental responsibility at the time of the act is upon the defendant,[5] and for the further reason that the credibility of the witnesses and whether the defendant has met his burden of proof are to be resolved by the jury.[6]

We believe the weight of the testimony is such that justice has probably miscarried and that it is probable a new trial will result in a contrary finding.

The record clearly reveals that this is not a case where the question of the defendant's mental condition was asserted for the first time after the act or the commencement of a criminal prosecution under circumstances that might suggest the defense is a self-serving afterthought to avoid legal responsibility. On the contrary, it appears without dispute that for at least four years

---

[4] "Discretionary reversal. In any action or proceeding brought to the supreme court by appeal or writ of error, if it shall appear to that court from the record, that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the supreme court may in its discretion reverse the judgment or order appealed from, regardless of the question whether proper motions, objections, or exceptions appear in the record or not, and may also, in case of reversal, direct the entry of the proper judgment or remit the case to the trial court for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with the statutes governing legal procedure, as shall be deemed necessary to accomplish the ends of justice."

[5] See sec. 971.15 (3), Stats.

[6] See State v. Bergenthal (1970), 47 Wis. 2d 668, 685, 178 N. W. 2d 16.

prior to the event the defendant did have some mental or emotional problems.

The expert testimony, which was the dominant portion of the trial, results in this summary—the doctor called by the defendant and two court-appointed witnesses all testified the defendant was legally insane; two doctors called for the state testified they could not form an opinion, and one doctor called for the state testified that he did not have an opinion but that maybe defendant did lack mental responsibility.

This is not the state of the record we found in *State v. Bergenthal, supra.* There was no pre-existing history of medical treatment for a mental or emotional problem and, most important, of the several psychiatrists who testified, at least one testified unequivocally that the defendant "did not lack substantial capacity to conform his conduct to the requirements of law or to appreciate the criminality of his conduct." [7] Here nobody testified he did not lack such capacity.

Considering the evidence as a whole, we conclude it predominates quite heavily on the side of the defendant on the issue of his mental responsibility that justice has miscarried and believe that a new trial will probably bring a different result. Therefore, in our discretion, a new trial is ordered in the interest of justice on the single issue of the defendant's special plea of not guilty by reason of insanity or lack of mental responsibility at the time of the act.

The judgment and sentence should be vacated insofar as they are affected by the new trial on the issue of mental responsibility and then to be revised or reinstated consistent with the outcome of the new trial. The defendant shall be released to the custody of the sheriff of Waukesha county to be held there subject to the orders of the circuit court.

[7] *State v. Bergenthal, supra,* page 687.

*By the Court.*—Affirmed in part; reversed in part and remanded for a new trial pursuant to this opinion.

ROBERT W. HANSEN, J. *(dissenting).* If a husband testified under oath that he shot and killed his wife because he dreamed she was an armed Martian who had invaded their bedroom, it would be for the jury, as trier of fact, to believe or disbelieve his statement as to why he did what he did.

But what if that husband were to make that statement, not under oath, to a psychiatrist? What if that psychiatrist believed the account of the nightmare about an invader from Mars to be truthful, and based an opinion as to the husband's insanity, in whole or in part, upon the truthfulness of such statement? Must the jury accept the husband's statement as being true because the psychiatrist so accepted it? If so, the psychiatrist, not the jury, becomes the trier of fact.

The defendant here told four psychiatrists that, on the evening that he shot and killed his wife, (1) he had been drinking heavily; (2) that he slept with a loaded revolver under his pillow; (3) that he dreamed that an armed Vietcong soldier invaded the bedroom where he and his wife slept; (4) that he remembered shooting the Vietcong soldier, heard a shot and awoke to see his wife dead in the bedroom; and (5) that he remembered nothing else about what happened until he found himself in Disneyland, California, where he had taken his two children. Three psychiatrists accepted all of these statements by defendant as believable. One psychiatrist did not so accept them.

Three psychiatrists—Drs. Fosdal, Otto and Altmeyer, the last two court-appointed—interviewed the defendant and testified that he was insane under the ALI test. It is clear they accepted as true defendant's statements concerning his drinking, dreaming and not remembering.

As to statements made by the defendant, Dr. Fosdal testified, "My impression of Mr. Kemp as a historian, he generally seemed quite reliable. The information he volunteered seemed to be quite sincere, quite frank, and most of what he said I thought he was quite reliable as a historian." Asked if his opinion would be different if he had not believed what the defendant told him, Dr. Fosdal answered, "If all was incorrect and a lie, it would probably change my opinion."

One psychiatrist—Dr. Charles Cahill—testified that he could not form an opinion as to defendant's sanity or insanity on the basis of the records he examined and defendant's statements when he interviewed him. (Dr. Cahill spent two and one-half hours interviewing defendant and nine hours reviewing hospital records.) It is abundantly clear that Dr. Cahill did not accept as reliable the statements made to him by defendant. As to such statements, Dr. Cahill found a "marked credibility gap." As to the statement about a Vietcong nightmare, Dr. Cahill concluded, "Whether or not this patient had a nightmare, as he says, is in my estimation entirely unfathomable. The description of this nightmare to me has some of the earmarks of a rationalization, or perhaps, more bluntly, an alibi." As to defendant's claim of not remembering taking his two children to California, Dr. Cahill testified, ". . . his comments to the children that they should not speak of anything that had happened, are also suggestive, at least hypothetically, that he was not in a state of complete behavioral disorganization." Dr. Cahill noted inconsistencies in what the defendant told him about drinking. Dr. Cahill testified that, when he asked defendant whether he knew how his wife died, defendant replied, "I know how she died— but I don't wish to answer for legal reasons. My attorney advised me not to say." Later in the interview, Dr. Cahill testified defendant added, "It's not good to remember

—past thoughts have to be put away because remembering won't help—it'll mess myself up with details. You need to know the whys and not all that happened." Dr. Cahill also testified that defendant admitted making false statements to the doctor at the Veterans Hospital in order to get out of the hospital. Dr. Cahill concluded, "In summary, exactly what happened on that night is in my estimation pure speculation. . . . There are so many variables, both known and unknown, that an opinion is a speculative guess."

Asked by the trial court whether he was saying "you don't think anyone can come to an opinion with reasonable certainty" as to defendant's sanity, Dr. Cahill answered, "That is correct." The exchange makes clear that Dr. Cahill was not disputing the opinions of the three other psychiatrists. Rather he was disputing or contradicting the adequacy or reliability of the basis of their opinions, to wit, the statements made by defendant as to what had transpired on the night of the murder. Dr. Cahill was making clear that defendant's statements as to his drinking, having a nightmare and remembering nothing after hearing a shot and seeing the body of his dead wife were subjective, marked by inconsistencies, and not to be accepted as the factual basis for an opinion as to defendant's sanity. In an exactly analogous situation, an Illinois court termed similar testimony to be ". . . related to the absence of objective facts, history and symptoms sufficient to form the basis of an opinion," and concluded ". . . questions were presented requiring resolution by the jury." (*People v. Ureste* (1972), 7 Ill. App. 3d 545, 550, 288 N. E. 2d 45, citing *People v. Burress* (1971), 1 Ill. App. 3d 17, 272 N. E. 2d 390, holding that the trier of fact "may consider the statements of the defendant as well as the physical and other facts in evidence.")

Given such conflict in expert testimony as to the credibility of defendant's account of what transpired, it was for the jury as trier of the facts to determine the credibility of defendant's statements. As this court said in an ALI test insanity case, ". . . The issue as to sanity remained for resolution by the trier of fact. The issue of credibility of witnesses and of whether the defendant had met his burden of proof in establishing the defense of insanity was for the jury to determine. . . ." (*State v. Bergenthal* (1970), 47 Wis. 2d 668, 685, 178 N. W. 2d 16.) In *Bergenthal,* no expert testimony was offered by the state on the sanity issue, and nonetheless this court held that ". . . a reasonable juror could find the defendant sane at the time of the commission of the crimes without reliance upon the testimony of the court-appointed experts," (*Id.* at pages 685, 686) stating: "The question of whether the defendant had met his burden of proof was one of fact for the jury, not one of law for the court." (*Id.* at page 686) In the case before us, given the testimony of Dr. Cahill as to the inconsistencies and lack of reliability of defendant's statements concerning his shooting and killing his wife, the jury here had a far stronger basis than in *Bergenthal* for finding defendant sane at the time of the commission of the crime of murder, second degree. So the writer would affirm.

I am authorized to state that Mr. Justice LEO B. HANLEY joins in this dissent.