SCHULTZ, Plaintiff in error, v. STATE, Defendant in error.

Supreme Court

*No. 76–553–CR. Submitted on briefs January 9, 1979.—*
*Decided January 30, 1979.*
(Also reported in 274 N.W.2d 614.)

For the plaintiff in error the cause was submitted on the brief of *Howard B. Eisenberg,* state public defender, and *Ruth S. Downs,* deputy state public defender.

For the defendant in error the cause was submitted on the brief of *Bronson C. La Follette,* attorney general, and *Maryann S. Calef,* assistant attorney general.

HEFFERNAN, J.   This is a review of a judgment of conviction for first-degree murder and a review of a post-trial order denying a new trial. The only question presented is whether the defendant, Schultz, submitted proof sufficient to establish the affirmative defense of

not guilty by reason of mental disease or defect "to a reasonable certainty by the greater weight of the credible evidence." Sec. 971.15(3), Stats. We conclude that he did not; and, accordingly, the trial court's determination that Schultz was not to be relieved of responsibility for the murder of his wife, Shelley, must be affirmed.

Schultz originally pleaded not guilty and not guilty by reason of mental disease or defect. The actual facts of the killing were never in dispute. Accordingly, Schultz withdrew his plea of not guilty and proceeded to trial before the court solely on the defense that he was not responsible for his criminal conduct, because, at the time of such conduct as a result of mental disease or defect, he lacked the substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law.[1]

The defendant's plea admitted that, but for the lack of mental responsibility, his conduct fulfilled all the elements necessary for the proof of first-degree murder. Sec. 971.06(1)(d), Stats.

The record developed at trial showed that the defendant, Irvin G. Schultz, was in his mid-twenties and his wife, Shelley, the victim, was about a year younger. The Schultzes were married in 1971. At the time of the shooting, they had one child, a son who was two and one-half years old.

---

[1] "971.15 **Mental responsibility of defendant.** (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

"(2) As used in this chapter, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

"(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence."

The Schultzes separated in October 1972. On October 27, 1972, Irvin sought help from the Family Counseling Center in Kenosha. He told Irene Nelson, a psychiatric social worker at the intake interview, that his wife had left him and had started divorce proceedings, and that he could not face life without her. As early as January of 1973, he mentioned the possibility that he was going to kill his wife. Nelson and Dr. Harold Schroeder, a consulting psychiatrist for the center, concluded Schultz was very sick and in need of hospitalization. Dr. Schroeder acknowledged that fear of Schultz was one reason why an involuntary commitment was not pursued. Schultz did, however, submit to medication designed to improve his capacity to perceive reality and to allay his anxiety.

On the day of the shooting, November 5, 1973, the defendant went rabbit hunting. He testified that he had a gap in his memory until he found himself in a car beside his wife's car. He remembered, however, that he had a shotgun in his hands and that he then shot her. Irene Nelson, who interviewed Schultz after the shooting, testified that Schultz told her he remembered very well the occasion of shooting his wife.

After the shooting, Schultz threw the discharged shotgun shell in the lake. He then went to his girlfriend's house, had dinner, had sexual relations with her, and cleaned the shotgun used in the shooting. Shortly thereafter, he surrendered himself to the sheriff's department and turned over the shotgun.

At trial, four experts appeared for the defense. They were Dr. Glenn Vandervort, Dr. Harold Schroeder, both psychiatrists, Dr. Paul Ciotola, a clinical psychologist, and Irene Nelson, a psychiatric social worker.

Dr. Vandervort testified that, on the basis of two interviews, Schultz was a paranoid schizophrenic, who lacked the substantial capacity either to appreciate the

wrongfulness of his conduct or to conform his conduct to the requirements of the law at the time the crime was committed. He concluded that Schultz was, under the definitions of sec. 971.15, Stats., not legally responsible for his conduct.

Dr. Schroeder, as related above, became acquainted with Schultz prior to the shooting at the Kenosha Family Counseling Center. He had met with him twice before the shooting and once after. Schroeder recited that Schultz told him that his wife deserved to be killed and that she prevented him from seeing his son, who was the only person who ever loved him. Dr. Schroeder concluded that Schultz was suffering from schizophrenia, paranoid type, and that he could not appreciate the consequences of his behavior at the time of the shooting and that he had no control over his conduct at the time he shot his wife.

Irene Nelson, the psychiatric social worker at the Family Counseling Center, was not permitted to testify in respect to the impact that Schultz' alleged mental illness had upon his capacity under sec. 971.15, Stats. Nevertheless, she was permitted to testify that she was of the opinion that Schultz could not control his conduct at the time he shot his wife. She testified that a Minnesota Multiphasic Personality Inventory test administered to him on October 30, 1972, indicated chronic undifferentiated schizophrenia or psychoactive schizophrenia.

Dr. Paul Ciotola, with a degree in clinical psychology, testified that, on the basis, of an interview with Schultz on December 20, 1973, and, on the basis of various tests, he was of the opinion that Schultz suffered from a schizophrenic reaction of either a paranoid or affective type. He stated that, in his opinion, Schultz' mental condition interfered with his ability to conform his conduct to the law or to appreciate the wrongfulness of his acts.

The state produced but one expert, Dr. Leslie Fai, a psychiatrist. Dr. Fai acknowledged that Schultz had a

serious personality disorder, but that his answers were indicative of a person who wanted to be thought more sick than he actually was. Fai said Schultz overemphasized his problems. He concluded that Schultz was a passive-aggressive personality, but that this was not a mental disease, but was descriptive of a type of personality. He found no trace of schizophrenia. He gave as his opinion that Schultz was able to conform his conduct to the requirements of the law and to appreciate what he did. He pointed out that Schultz' amnesia was "selective." He also found no evidence of "emotional flattening," which is symptomatic of schizophrenia. He said that the expressed love Schultz had for his child and his hatred for his wife and others were entirely inconsistent with the flattening of emotion that is a concommitant of schizophrenia.

The trial court carefully reviewed the conflicting evidence and expressed its conclusions in a 13-page decision. The court concluded that there was "a finding of mental illness to some degree both before and at the time of the act and even now." It questioned, however, the degree of mental illness and its effect upon the defendant. It concluded that "the defendant was temporarily affected with an overpowering influence of passion or emotion which he might have and ought to have controlled." The court recognized the dispute in the expert testimony. It relied, however, upon Dr. Fai's testimony and stated, at the hearing on the motion for a new trial, "the testimony of one witness in this case was more credible and believable than that of several witnesses, and the Court is satisfied the judgment of conviction is supported by the evidence."

We conclude that the evidence relied upon as credible by the trial court was sufficient to reject the affirmative defense of diminished criminal responsibility as the result of mental disease or defect.

A defendant who pleads not guilty by reason of mental disease or defect has the burden of establishing this affirmative defense "to a reasonable certainty by the greater weight of the credible evidence." Sec. 971.15(3), Stats. The issues of credibility of witnesses and whether the defendant met his burden of proving lack of capacity by reason of mental disease or defect are for the trier of fact to determine. *Beavers v. State*, 63 Wis.2d 597, 609, 217 N.W.2d 307 (1974); *State v. Bergenthal*, 47 Wis.2d 668, 685, 178 N.W.2d 16 (1970). In cases of conflicting expert testimony, it is the role of the trier of fact to determine weight and credibility. *Sprague v. State*, 52 Wis.2d 89, 99, 187 N.W.2d 784 (1971); *McCool v. State*, 51 Wis.2d 528, 530, 187 N.W.2d 206 (1971). This role is not different when the trial court, rather than a jury makes the determination of capacity under sec. 971.15. *See, Lewis v. State*, 57 Wis.2d 469, 473, 204 N.W.2d 527 (1973). Even when the state presents no expert testimony to rebut defense expert testimony of lack of capacity, the trier of fact is not obliged to believe defense experts, at least where other evidence undercuts their opinions. *Pautz v. State*, 64 Wis.2d 469, 475–77, 219 N.W.2d 327 (1974).

The principle that the trier of fact is assigned the role of evaluating the weight and credibility of witnesses is not disputed by the defendant. Yet the defendant argues that Dr. Fai's testimony was incredible and should be rejected on this appeal. There is nothing so inherently unreasonable about Dr. Fai's opinion as to make it incredible as a matter of law. The record supports the trial court's conclusion that the defendant, while quite probably suffering from some degree of mental illness, did not lack substantial capacity to either appreciate the wrongfulness of his conduct or conform his conduct to

the requirements of the law. The trial court, having considered the testimony of Dr. Fai, and having reached the conclusion that it was credible, could properly conclude that the defendant had failed to sustain the burden of proving his affirmative defense under sec. 971.15, Stats.

The defendant relies on *Kemp v. State*, 61 Wis.2d 125, 211 N.W.2d 793 (1973). In *Kemp*, six psychiatrists testified at trial on the issue of capacity, with three stating that the defendant lacked substantial capacity, two stating that they could not express an opinion, and one stating that he could not express a definite opinion but the defendant may have lacked substantial capacity. A new trial was granted in the interests of justice under the discretionary power of this court authorized by sec. 251.09, Stats. The court reaffirmed the principle that the credibility of witnesses and the question of whether the defendant met his burden of proof are for the fact-finder. *Id.* at 137. But because of the compelling facts of that particular case, including a four-year history of mental problems and the absence of *any* expert opinion that defendant had substantial capacity, this court used its discretionary power to reverse. The evidentiary posture of this case is far different. In the instant case, there was competent psychiatric testimony that the defendant had substantial capacity as defined in sec. 971.15.

The standard for granting a new trial in the interests of justice is that the court must be convinced that there has been a probable miscarriage of justice, that the defendant should not have been found guilty, and that a new trial would lead to a different result. *Lofton v. State*, 83 Wis.2d 472, 489–90, 266 N.W.2d 576 (1978); *State v. Bergenthal*, 47 Wis.2d 668, 688, 178 N.W.2d 16 (1970). In *Kemp, supra* at 137, the court concluded that a new trial would probably result in a contrary finding. We cannot, in the instant case, reach that conclusion.

The discretionary power under sec. 251.09, Stats., is exercised with great caution. *Ferry v. State,* 266 Wis. 508, 511, 63 N.W.2d 741 (1954). The exercise of that power is inappropriate in the present case.

*By the Court.*—Judgment and order affirmed.