STATE, Plaintiff-Respondent, v. SARINSKE, Defendant-Appellant.

Supreme Court

*No. 76–452–CR. Argued January 30, 1979.—Decided June 29, 1979.*
(Also reported in 280 N.W.2d 725.)

16

22

For the appellant there were briefs by *DeBardeleben & Snyder* of Park Falls, and oral argument by *Arthur DeBardeleben.*

For the respondent the cause was argued by *Edward S. Marion,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

SHIRLEY S. ABRAHAMSON, J. On October 8, 1976, the same jury which earlier found defendant Roger Sarinske guilty of first-degree murder refused to find him not guilty by reason of mental disease. The defendant was sentenced to life imprisonment. He appeals from the judgment of conviction and sentence and from the order denying his motions after verdict. We affirm the judgment and order.

Defendant raises numerous issues on appeal. Several challenge the fairness of the trial, several confront specific evidentiary rulings, and several concern instructions given to the jury. In addition, defendant argues that there was insufficient evidence to establish guilt beyond a reasonable doubt and that the jury could not reasonably have failed to find him not guilty by reason of mental disease or defect. Finally, defendant requests a new trial in the interest of justice.

## I.

The defendant Roger Sarinske was charged with first-degree murder on March 3, 1976 of Paul Paulie. At the time of the offense he was a thirty-two year old resident of Crandon, Wisconsin, he had been married to Sandra Sarinske for eight years, and they had three children. Roger Sarinske was completing work on his Master's degree in communicative disorders, a field in which he had worked for some years prior to his return to school. Sandra Sarinske was employed as an English instructor at Nicolet College in Rhinelander.

Over a period of several years, Sandra Sarinske had had a series of extramarital affairs of which the defendant was aware. In the several months prior to the killing, Sandra Sarinske had engaged in sexual relations with two students from Nicolet, Robin Jensen and the deceased, Paul Paulie. Jensen considered Paulie a rival for the affections of Sandra Sarinske. These extramarital liaisons created (or manifested) difficulty in the marriage, although Sarinske's reaction was one of concern for his wife's emotional well-being and for the continued cohesion of the family unit. On February 23, 1976, the Sarinskes agreed to a month of separation.

By the terms of their informal separation agreement, the Sarinskes were not to see each other during the intervening month. However, on March 2, 1976, as he was driving from River Falls to Chicago Roger Sarinske decided he wanted to see his wife without speaking to her. He detoured to drive by his home, and in the early hours of March 3, en route to Crandon, tired from a long, difficult drive and a week of final exams and little sleep, Sarinske drove through Rhinelander and saw his wife's car parked in front of the Wonder Hotel, the hotel in which he knew Paul Paulie lived. During the guilt phase of the trial, Roger Sarinske testified that he had no memory of what transpired after seeing his wife's car until he found himself in jail. The defendant was asked if he had shot Mr. Paulie, and he stated "I don't know if I shot him." At the insanity portion of the bifurcated trial, the experts who examined Roger shortly after the killing reported getting at that time a considerably more detailed version of the events of the night.

Sandra Sarinske confirmed that she and Paul Paulie spent the day and evening of March 2 together, including having sexual relations, and that at about midnight they drove to the Sarinske home. According to Mrs. Sarinske, as she and Paulie were walking towards her home, she somewhat ahead of him, she heard her husband yell

"Hey, Paulie," saw a flash, and then saw Paulie jump in the air and fall to the ground after yelling "No." When she approached the victim's body she saw her husband with a shotgun in his hands standing near the victim. She further testified that she tried to phone the rescue squad, but that her husband grabbed her by the scarf she was wearing around her neck and dragged her back towards Paulie, at which point the victim, still moving but bleeding from the wound to his midsection which caused his death within twenty minutes, said to her "I'll never touch you again." She again attempted to make a call for help, but Roger who was, according to her, extremely upset and violent, ripped the receiver of the phone from the wall and disabled the other phone connection in the house.

At approximately 3:40 a.m., somewhere between one and two and a half hours after Paulie was shot, the chief of Crandon's police department, L. W. Dodd, received a call at home. The caller identifying himself as Roger Sarinske, told Dodd that he had just shot and killed a man with a shotgun. Dodd, who knew Sarinske somewhat, recognized his voice. Dodd and one of his men went directly to the Sarinske residence, found the body in the driveway, and went inside the house to find Roger Sarinske seated at the kitchen table. Upon Dodd's arrival Roger was calm and cooperative.

During the trial, defense counsel attempted to throw doubt upon the main facts of the killing (as related by Mrs. Sarinske and as suggested by the physical evidence) and to suggest that another person, perhaps Robin Jensen, had shot Paulie from the second story of the house. Defense challenged prosecutorial evidence on the angle at which the fatal projectiles traveled and pointed to the spent shotgun shell on the second floor of the house. Defense attempted to discredit the testimony of Mrs. Sarinske, and focused on Mrs. Sarinske's supposed

uncertainty as to whether she saw the flash when she was facing the house or facing the victim. Defense counsel succeeded in showing that Jensen and probably Sandra Sarinske made inconsistent statements about how often they had seen one another since the killing, but a witness testified that Robin Jensen was with him the night of March 2–3.

After the jury found Roger Sarinske guilty of first-degree murder (jury instructions relating to second-degree or manslaughter were neither submitted nor requested by defense), the jury heard testimony from lay and expert witnesses concerning Roger Sarinske's mental health. Roger Sarinske was described as a constructive citizen; he performed volunteer work in the community; he aided handicapped children while he was in the military service. Even in giving the most negative testimony about their marital relations, Sandra Sarinske observed that he was a "very, very kind and gentle" person to others, if not to her. However several witnesses testified that Roger's reaction to Sandra's infidelities was "too good," that over the years he failed to express even indirectly any anger at her or her lovers. Paul Paulie and his roommates, after Roger went to Paulie's room to ask him to leave Sandra alone for her own good, accorded him the nickname "St. Francis" because of his forgiving attitude and lack of hostility.

Mrs. Sarinske testified that her husband beat her about 25 to 30 times in their marriage, most violently after shooting Paulie. Roger admitted to having hit her once or twice with his open palm when she became nearly hysterical, but claimed that he most frequently just yelled, or restrained her by putting his arms around her when she was abusing him. Mrs. Sarinske testified that in January 1976 Sarinske shot and killed a dog who was bothering their female who was in heat; he testified that he had shot away from the dog to fright-

en the dog off after it had jumped on one of the children and failed to respond to his yelling. At the time of the trial, Roger and Sandra were living together as man and wife after she withdrew an intervening divorce action.

Against this background, three experts in psychology, one psychologist and two psychiatrists, testified on the question of mental disease. The two defense experts concluded that Sarinske was suffering from a mental disease known as dissociative reaction and that he had killed Paulie while in a particular phase of that disease. In contrast, the state's expert, Dr. Fosdal, declined to characterize Sarinske as suffering from a mental disease and instead described Sarinske's condition as one resulting from continual stress. Fosdal said that Roger's impairment of both ability to appreciate the wrongfulness of his conduct and of the ability to conform his conduct to the law was "substantial." He further commented that "the examiners will vary as to the ease with which they will call a passionate upsetting moment—call this that . . . or call that a dissociative reaction." Further facts will appear in the opinion.

## II.

The defendant contends, on several grounds, that he was denied a fair trial.

### A.

Sarinske maintains that the judge's informing the jury at the commencement of the trial of both the "not guilty" and the "not guilty by reason of mental disease or defect" pleas deprived him of due process of law.

The trial court in informing the jury of both pleas was acting in accordance with this court's mandate in *State ex rel. La Follette v. Raskin*, 34 Wis.2d 607, 627, 150

N.W.2d 318 (1967) that the jury be informed of both pleas "at the outset." Sec. 971.175, Stats., provides that the jury shall be advised of the two pleas and that there be a separation of the issues with the guilt issue heard first:

"Sec. 971.175 **Sequential order of proof.** When a defendant couples a plea of not guilty with a plea of not guilty by reason of mental disease or defect, there shall be a separation of the issues with a sequential order of proof before the same jury in a continuous trial. The guilt issue shall be heard first and then the issue of the defendant's mental responsibility. *The jury shall be informed of the 2 pleas and that a verdict will be taken upon the plea of not guilty before the introduction of evidence on the plea of not guilty by reason of mental disease or defect.* This section does not apply to cases tried before the court without a jury." (Emphasis added.)

Sarinske argues that advising the jury of both pleas before their determination of the guilt issue is tantamount to informing the jury that the defendant is saying, with apparent inconsistency: "I did not commit all the essential elements of the offense charged, and I was not mentally responsible at the time I committed the offense." Because of this seeming inconsistency the defendant fears that the jury inferred from the plea of not guilty by reason of mental disease or defect that he was tacitly admitting that he committed the crime charged. Sarinske says he was thereby deprived of the presumption of innocence to which he was entitled[1] and of due process of law.

We have previously held that it is not a denial of due process to have the same jury decide the question of

---

[1] Sec. 939.70, Stats., provides "no provision of the criminal code shall be construed as changing the existing law with respect to presumption of innocence or burden of proof."

criminal responsibility after deciding the question of guilt. We concluded that there is no reason to believe that a jury properly instructed will deny an accused a fair trial on the second issue tried, simply because the jury decided that the accused was guilty of the crime. *Grennier v. State,* 70 Wis.2d 204, 218, 219, 234 N.W.2d 316 (1975).[2] Similarly we are unwilling to say that a jury properly instructed will deny an accused a fair trial on the guilt issue, the first issue tried. We do not believe that a jury necessarily would believe that an accused admitted guilt by offering a plea of not guilty by reason of mental defect or disease.[3]

This dilemma of "inconsistent" positions which Sarinske poses is not novel or unique to the presentation of pleas in a bifurcated trial. An accused who would contend that he did not pull the trigger but would also contend that the homicide was accidental or justified faces

---

[2] In *Grennier v. State,* 70 Wis.2d 204, 218, 219, 234 N.W.2d 316 (1975), we quoted with approval the following language from *People v. Wein,* 50 Cal.2d 383, 408, 326 P.2d 457 (1958), which in turn quoted from *People v. Leong Fook,* 206 Cal. 64, 78, 273 P. 779, 785 (1928):

"We must assume that a fair and impartial jury of intelligent men and women would obey . . . [their] instructions and would therefore hold in reserve their ultimate finding upon the issue of the defendant's sanity until that separate issue and the evidence supporting it had, in the prescribed order of the trial, been committed to it for determination. We are not to assume that such a jury will cease to be fair and impartial as the cause progresses upon its successive issues, but, on the contrary, we must assume, in the absence of any other showing, that the jury has retained its attitude of fairness and impartiality under the changed procedure as before until the whole cause . . . has been determined."

[3] In *People v. Wein, supra* note 2, the California court reached the same conclusion as we do in this case. It appears that in most states the practice is to conduct a single trial and to submit the issue of guilt and the issue of insanity at the time of the crime at the same time to the same jury. Note, *Criminal Law—First-Degree Murder—Evidence of Diminished Capacity Inadmissible To Show Lack of Intent,* 1976 Wis. L. Rev. 623, 636.

the insoluble problem of maintaining the latter stance without seeming to concede he did the killing. An accused is not entitled under the constitution to a separate trial on each apparently inconsistent defense in the case.[4]

Furthermore, the facts of the case do not justify granting Sarinske a second jury. There is no showing that in this particular case substantial prejudice may result from the same jury trying both issues.

Some courts have recognized the need for a bifurcated trial with two juries in order to provide an accused with a fair trial where the accused presents a substantial defense both on the merits and on the issue of responsibility.[5] In the case at hand Sarinske did not present a substantial defense on the merits. While the facts overwhelmingly pointed to him as the killer, Sarinske could not even deny that he killed Paulie; his claim was that

[4] Even if we were to accept Sarinske's contention that informing the jury of both pleas at the commencement of the action is prejudicial, the simple solution he poses, namely not to tell the jury of the "insanity plea" until after guilt is determined, may not be adequate. The state and the defense would most probably want to question prospective jurors on their attitudes toward an insanity defense. This questioning would be done before trial, and the accused might view such questions as similarly prejudicial because they telegraph to the jury that the accused will plead "insanity."

*See People v. Wein, supra* note 2, where the defendant withdrew his plea of guilty by reason of insanity because he thought the jurors would be prejudiced on the guilt issue by a voir dire examination which included questions about their attitudes toward an insanity defense.

If we accepted Sarinske's argument, which we do not, a bifurcated trial with two juries would be constitutionally mandated in every case in which the accused pleads not guilty and not guilty by reason of mental defect or disease.

[5] Courts have recognized that substantial prejudice may result by intermingling at trial the insanity defense with the defense on the merits. *United States v. Greene,* 489 F.2d 1145, 1157 (D.C. Cir. 1973); *Holmes v. United States,* 363 F.2d 281, 282 (D.C. Cir. 1966).

he did not remember. In the guilt phase of the trial, as was his right, Sarinske's strategy was to put the state to its proof.

### B.

Sarinske asserts that he was deprived of his constitutional right to a trial "by an impartial jury." Sec. 7, Art. I, Wis. Const.;[6] Amends. VI and XIV, U.S. Const.[7] Specifically, defendant asserts that he was compelled to exercise his peremptory challenge to strike four prospective jurors who had formed an opinion and that one person who had stated on voir dire that he had formed an opinion regarding Sarinske's guilt on the basis of what he or she had read or heard and whom defense did not strike became foreman of the jury. The state points out that the defense could have challenged the latter juror. Section 972.03, Stats., gives the accused six peremptory challenges when the crime charged is punishable by life imprisonment.

---

[6] Sec. 7, Art. I, Wis. Const. provides:
"In all criminal prosecutions the accused shall enjoy the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face; to have compulsory process to compel the attendance of witnesses in his behalf; and in prosecutions by indictment, or information, to a speedy public trial by an impartial jury of the county or district wherein the offense shall have been committed; which county or district shall have been previously ascertained by law."

[7] Amendment VI, U. S. Const. provides:
"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

We conclude that there was no abuse of discretion by the trial court in the case at bar in not excusing the jurors. The mere expression of a predetermined opinion as to guilt during the voir dire does not disqualify a juror *per se*. If the person can lay aside his or her opinion and render a verdict based on the evidence presented in court, then he or she can qualify as an impartial trier of fact. The decision "as to the subjective sincerity" of the prospective juror "in expressing his final view of fairness is a matter within the discretion of the trial court." *State v. Nutley*, 24 Wis.2d 527, 546, 129 N.W.2d 155 (1964). Each potential juror was questioned individually by counsel and judge, with no person present except the juror, counsel, judge and court personnel. Although the individual examinations reveal some confusion by a few of the potential jurors concerning the presumption of innocence, each juror was asked if he or she could set aside his or her opinions and rule solely on the evidence received in court. Each said yes.

## C.

Sarinske asserts that he is entitled to a new trial because the trial judge repeatedly showed his bias in favor of the state and his prejudice against the defense. He sets forth instances in chambers and in open court which he claims illustrate that the trial judge manifested bias and prejudice against the defense and that the trial judge aligned himself with the state. Sarinske claims the judge signalled that his sympathies and convictions were with the state by being rancorous, sarcastic, and belittling to or critical of defense counsel and in addressing the district attorney in a manner which absolved him of any impropriety. Sarinske sets forth examples which he says show that the trial court conveyed to the jury

the impression that the defense was responsible for delay. Defendant's brief concludes its description of the trial judge's misconduct by stating that "while any one of the instances of abuse of defense counsel by the trial court may not constitute prejudicial error requiring a new trial, the repeated attacks and demonstrations of impatience and irritation tend to show that the trial court's rancor was so abiding as to create an 'overcast of unfairness' requiring a new trial."

Every person charged with a crime is entitled, under the federal and state constitutions, to a fair trial which includes the right to be tried by an impartial and unbiased judge. *State v. Bell,* 62 Wis.2d 534, 536, 215 N.W. 2d 535 (1974). In *Pulaski v. State,* 24 Wis.2d 450, 458, 129 N.W.2d 204 (1964), *cert. denied* 379 U.S. 862 (1965), this court stated with respect to the conduct of the trial judge:

"In a jury trial, a trial judge must be ever careful not by word or action to unconsciously influence the jury or to convey any impression contrary to his impartial status."

We have read the entire record. This was a difficult and hard-fought case. Counsel were persistent in their objections and arguments. We conclude that the demeanor of the trial court was authoritative and commanding; the trial court conducted the trial in a strong but generally even-handed manner. The record does contain comments evincing the trial court's impatience with defense counsel. The record in the case at bar is far from bland, but in our opinion the conduct of the trial court cannot be condemned as hostile or biased requiring reversal on the ground that the defendant was denied his constitutional right to a fair trial.

Furthermore the trial court gave the standard instruction to the jury to disregard any impression of the

judge's opinion which it might have received during the course of the trial or in the giving of the instructions and to decide the issues solely on the evidence. The jury was instructed to disregard any question to which an objection was sustained; not to speculate regarding what the answer might have been; not to draw an adverse inference from any such objection, and to disregard any implication or inference which might have arisen from a question which might have implied that certain facts were true. The court instructed the jury that the attorneys had the right and the duty to object to improper questions and to the admission of evidence which they believed was not admissible.

Although we have frequently said that possible prejudice to an accused is presumptively erased from the jury's collective mind when admonitory instructions have been given by the court, *Roehl v. State*, 77 Wis.2d 398, 413, 253 N.W.2d 210 (1977), we recognize that frequent and repeated misconduct by the trial court cannot be cured by a simple jury instruction. However from an examination of the entire record, we do not believe that the jury was improperly influenced to the detriment of the defendant by the conduct of the trial judge. We conclude that the defendant was not denied his right to a fair and impartial trial.

### D.

We now turn to consider Sarinske's claim that he is entitled to a new trial because of the improper and prejudicial conduct, arguments and remarks of the district attorney.

Sarinske asserts that the district attorney failed to comply with the trial court's order requiring the disclosure to him, prior to trial, of matter which was exculpatory and related to the credibility of Mrs. Sarinske.

In *Brady v. Maryland,* 373 U.S. 83, 87 (1963), the Supreme Court of the United States held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." We have said that "the purpose of trial is as much the acquittal of the innocent as it is the conviction of the guilty. Although the prosecution acts within the adversary system, there is ample room in that system . . . to require the state to disclose exculpatory evidence to the accused." *Nelson v. State,* 59 Wis.2d 474, 482, 208 N.W. 2d 410 (1973).

*Brady* requires production of information which is within the exclusive possession of state authorities. Exclusive control will not be presumed where the witness is available to the defense and the record fails to disclose an excuse for the defense's failure to question him. *State v. Amundson,* 69 Wis.2d 554, 573, 574, 230 N.W.2d 775 (1975) ; *State v. Calhoun,* 67 Wis.2d 204, 214, 226 N.W. 2d 504 (1975).

The alleged exculpatory evidence is the supposed knowledge of David Kellin and Darrell Wilson that Sandra Sarinske's automobile had an electrical short circuit. Kellin and Wilson were the defendant's witnesses. Thus it appears the "evidence" was not within the exclusive control of the state, and consequently there may have been no duty to disclose the evidence to the defendant even if the district attorney was aware of the electrical short circuit.

Even if a violation of the state's duty to disclose existed, a new trial is not required, since disclosure could not have affected the verdict of the jury. *Nelson v. State, supra,* 59 Wis.2d at 486. The existence of a short circuit

in Sandra Sarinske's automobile cannot be characterized as information "which tends to negate the guilt of the defendant . . . ." *Nelson v. State, supra,* 59 Wis.2d at 479. The electrical short circuit does not support the defense's assertion that "someone other than the defendant was involved in a struggle with the victim of the homicide immediately prior" to the crime.[8]

Sarinske further asserts that because Kellin's personal knowledge of the existence of an electrical short circuit did not surface until the second phase of the trial, it constitutes newly discovered evidence justifying a new trial. As we stated in *State v. Boyce,* 75 Wis.2d 452, 457, 249 N.W.2d 758 (1977), a motion for a new trial upon the ground of newly discovered evidence is addressed to the sound discretion of the trial court, and this court will reverse the trial court only for an abuse of discretion. The requirements for granting a new trial for newly discovered evidence are:

" '. . . (1) The evidence must have come to the moving party's knowledge after a trial; (2) the moving party must not have been negligent in seeking to discover it; (3) the evidence must be material to the issue; (4) the testimony must not be merely cumulative to the testimony which was introduced at trial; and (5) it must be reasonably probable that a different result would be reached on a new trial.' " *Sheehan v. State,* 65 Wis.2d 757, 768, 223 N.W.2d 600, 606 (1974).

---

[8] David Kellin theorized to the defense that a violent argument and struggle occurred in the Sarinske automobile between Mrs. Sarinske and Paulie. He found the electrical short circuit proof of his "struggle theory." He believed that during the struggle the cable leading to the electrical seat was damaged and this damage caused the battery to heat up, arcing and melting a line in the battery case. Kellin theorizes that as a result of the fight Mrs. Sarinske killed Paulie and that Sarinske is covering up for her.

Sarinske's assertion that the battery damage is evidence that he did not kill Paulie is based on Kellin's "theory" which in turn is based on nothing but speculation and conjecture.

If the newly discovered evidence fails to meet any one of these tests, the moving party is not entitled to a new trial. *Sheehan, supra,* 65 Wis.2d at 768, 223 N.W.2d at 606.

The defendant in the case at bar has failed to satisfy the requirements for granting a new trial. As we have previously stated, we do not believe that the evidence is material to any issue and it is not reasonably probable that if the newly discovered evidence is presented, a different result would be reached on a new trial.

Sarinske also argues that the district attorney made improper and prejudicial argument and remarks upon the trial of the action. One example cited by Sarinske is the district attorney's informing the jury during his opening statement that it was "customary for both the counsel for the defendant and counsel for the state, myself, to give the opening." We agree with the state's position that there is no support for defendant's contention that the district attorney, by these opening remarks, intentionally tried to impress the jury with the fact that defendant's reservation of his opening statement was improper in a "calculated" move "to secure an unfair advantage." A more likely reason for the district attorney's remarks is that they were merely his way of introducing his own opening statement. The trial court instructed the jury that defense counsel had a right to reserve his opening statement and make it at the conclusion of the state's case as "a matter of his choice." No possible prejudice could have resulted in light of this instruction. We cannot accept defendant's allegation that the trial court affirmed the district attorney's "improper" conduct.

We have reviewed the entire record and cannot conclude that any conduct of the district attorney was of such a nature to be characterized as improper and prejudicial or to be sufficient to warrant reversal.

### III.

We next turn to those issues raised by the defendant which center on the sufficiency of the evidence and specific evidentiary rulings in the guilt part of the trial to which Sarinske objects.

### A.

Sarinske contends that the evidence at trial was insufficient to sustain the jury verdict finding him guilty of the first-degree murder of Paul Paulie.

This court described the standard on review of a jury verdict in *Baldwin v. State*, 59 Wis.2d 116, 121, 122, 207 N.W.2d 630 (1973) as follows:

"In a criminal prosecution if there is any credible evidence which in any reasonable view supports the verdict it cannot be disturbed on appeal. . . . At trial, the state must prove defendant's guilt beyond a reasonable doubt; however, on appeal reversal is warranted only when the evidence considered most favorable to the state and conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of facts acting reasonably could be convinced to the degree of certitude the law defines as beyond a reasonable doubt. . . ."

In the case at bar there is more than sufficient evidence to convince a jury, acting reasonably, beyond a reasonable doubt that Sarinske intentionally shot and killed Paul Paulie. Sandra Sarinske testified that she heard her husband shout to Paulie, that she saw a flash, that she saw Paulie hit by a shot, and that she turned to see her husband holding a gun. While Paulie lay bleeding to death, she ran back to the house and was prevented by Sarinske from summoning help. Sarinske himself testified that he saw Sandra's car in front of the hotel

where the victim lived, that he knew of the victim's relationship with his wife, and that he did not know whether he killed Paulie. Sarinske's voice was identified by Dodd as that of the man who called, identified himself as Roger Sarinske, and informed Dodd that he had just shot and killed a man.

Defendant suggests that there are several sources of reasonable doubt which the jury must have ignored in order to reach its verdict. The defendant is correct that the state's case rested in large part upon the testimony of Sandra Sarinske. Although the defense attempted to cast doubt on her credibility, her testimony is not incredible as a matter of law. The jury obviously chose to believe her. Sarinske is correct in noting that the state's firearm expert could not identify the gun and shells found at the scene as the instruments by which the victim met his death and that the state's expert could not detect any traces of powder on the jacket worn by the victim at the time of the shooting. Nevertheless, the jury could believe that this gun was the fatal weapon and that the killer was standing outside the house when the gun was fired. The defendant contends there was considerable confusion about the angle of entry of the fatal shot, establishing that the gun may have been shot from the second story of the house. The defense attempted to create such confusion but the jury could have disregarded it. Sarinske contends that Robin Jensen could have been in the house and shot Paulie. There is credible evidence that Jensen was elsewhere, and there is no evidence that he was anywhere in the vicinity except in theory. Under a grant of immunity, Jensen testified that he did not shoot Paulie.

The state's case also rested on the telephone confession by Sarinske to Chief Dodd. Defense counsel attempted to show that Chief Dodd did not really recognize Sarinske's voice on the phone, but the defense was unsuccessful in creating a reasonable doubt that it was anyone but

Sarinske who informed Dodd of a killing, identified himself as Sarinske, and confessed to the killing.

Sarinske asserts that there was no testimony from which the jury could conclude that the shooting was a deliberate act. Testimony is not required. The jury can determine intent from all the facts in evidence concerning the offense.

It must be kept in mind that on review the standard is not whether this court is convinced of the defendant's guilt but whether the court is satisfied that a jury acting reasonably could be so convinced. We conclude that there is sufficient evidence of probative value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.

## B.

Defendant claims that several trial court rulings on evidence are erroneous and warrant reversal of his conviction.

First among defendant's complaints is the admission of two photographs of the victim's corpse. Defendant argues that they add nothing to the testimony and are inflammatory. Sec. 904.03, Stats., sets forth the general rule that evidence though relevant is excludable if its probative value is substantially outweighed by the danger of unfair prejudice. Whether photographs are to be allowed is a matter of discretion with the trial judge. *Hayzes v. State,* 64 Wis.2d 189, 198, 218 N.W.2d 717 (1974).

The trial court explained that the photographs served as visual aids to enable the jury to understand better the facts of the case and that the colored photograph might

help the jury determine the angle of entry of the fatal shotgun blast. Despite the somewhat thin probative value of the photographs and the disagreeableness of a color photograph of the victim taken immediately prior to the autopsy, we conclude the trial court applied the appropriate standards in exercising its discretion, and we cannot say there was an abuse of discretion.

Sarinske next objects to the trial court's having allowed a witness, over defense objections, to comment upon the pleasant and helpful character of the victim. When defense attempted to submit rebuttal evidence, the trial court reconsidered its original ruling, admitted its error, and instructed the jury to disregard such testimony altogether. *Cf.* sec. 904.04(1)(b), Stats. There is nothing in the record to indicate that the instruction was not sufficient to cure any prejudice which might have been caused.

Defendant next takes issue with the testimony by Sandra Sarinske concerning his tearing the phone off the wall, claiming that her testimony violated the defendant's marital privilege set forth in sec. 905.05(1), Stats.[9] While defendant correctly cites *Muetze v. State*, 73 Wis. 2d 117, 243 N.W.2d 393 (1976), for the proposition that "private communication" within the meaning of the statute includes "expressive acts which are intended to convey information of a privileged character," the conduct in question in the instant case cannot reasonably be considered to be primarily communicative. By the violence and the purposiveness of his actions, Roger Sarinske

---

[9] Sec. 905.05(1), Stats. provides:

"(1) GENERAL RULE OF PRIVILEGE. A person has a privilege to prevent his spouse or former spouse from testifying against him as to any private communication by one to the other made during their marriage."

clearly intended to stop his wife from summoning aid, not to impart knowledge or information made privileged under sec. 905.05 (1), Stats.

Defendant complains that the trial court should have admitted the following three documents to show the possibility that some person other than Sarinske committed the offense and to document the bias of and to impeach the credibility of Jensen and Mrs. Sarinske: a letter written by Jensen to Sandra Sarinske after the shooting; a letter by Sandra Sarinske to Roger Sarinske; and the district attorney's notes of a conference with Jensen. We do not agree with the defendant's assertion that the documents tend to prove that some other person committed the act. The inconsistencies in Jensen's and Mrs. Sarinske's testimony had been pointed up; further proof would not be decisive in impeaching their credibility. The trial court has considerable discretion in deciding the extent of an inquiry with respect to bias. *State v. Williamson,* 84 Wis.2d 370, 383, 267 N.W.2d 337 (1978). None of the three documents is so persuasive, so unambiguous, or so relevant and material that we can say the trial court abused its discretion or committed prejudicial error in refusing to admit it.

Sarinske claims that the trial court erred in admitting several exhibits as evidence allegedly without "proper foundation." *See* Judicial Council Committee's Note, sec. 909.01, Wis. Rules of Evid., 59 Wis.2d R329.

With respect to a series of photographs showing a trail of footprints from defendant's car to the back of the house, defendant argues that there "is nothing in the record from which the identity of the person who made the footprints can be inferred." Defendant is correct that no expert testified as to footprint identification. However the evidence of the footprints was relevant

without such specific identification. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Sec. 904.01, Stats. In light of the testimony placing only the defendant, the defendant's wife, and the victim at the scene, the jury could reasonably infer that the footprints were those of the defendant and that the defendant was at the house. Defendant's objection goes not to the admissibility of the photographs but to the weight to be given them. The photographs depicting a trail of footprints were properly authenticated in accordance with the Wisconsin rules of evidence. The state laid a foundation for the admissibility of these photographs by examining the photographer with respect to each photograph. This testimony satisfies secs. 909.01 and 909.015(1), Stats. *Merriman v. Cash-Way Inc.*, 35 Wis.2d 112, 118, 150 N.W.2d 472 (1967).

Defendant argues that there was no foundation for the admission of a shotgun and shotgun shells and the photographs of these items. A review of the record shows that a foundation was laid for the admissibility of this evidence. Chief Dodd identified the shotgun, spent shell and box of shells as the one which he found on the floor of the Sarinske residence upon his arrival shortly after the murder. He recounted his placing an identification tag on the gun with the date, his name, and other information. The state established the chain of custody. Dodd also laid the foundation for the admissibility of the photographs by identifying both photographs as having been taken by him and as accurately portraying what they purport to portray. The requirements of sec. 909.01, Stats., were thus met.

Sarinske argues on appeal that there was no foundation for the admission of Chief Dodd's testimony that at

approximately 3:40 a.m. on March 3, 1976, the defendant telephoned him and told him: "I have just shot and killed a man." Sarinske contends that there was "no testimony from which the jury could conclude that Dodd had any basis for recognition of the caller's voice as that of the defendant."

Section 909.015(5), Stats., provides:

"909.015 **General provision; illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of s. 909.01.

" . . .

"(5) VOICE IDENTIFICATION. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

Dodd admitted he had never spoken to Sarinske on the telephone but Dodd had talked to Sarinske on several occasions. Dodd's statement that he recognized the voice as that of Roger Sarinske coupled with his testimony relating to several previous conversations supplied the necessary foundation for the admissibility of his identification. Secs. 909.015(5) and 909.01, Stats. It was for the jury to decide whether Dodd could, on the basis of his prior conversations with Sarinske, identify the caller.

Sarinske also objects to the trial court's permitting the state, over objection of defense counsel, to elicit testimony from Dodd and from the state's pathologist by means of leading questions. "A leading question is one which unmistakably suggests the desired answer." *Wright v. City of Fort Howard,* 60 Wis. 119, 121, 18 N.W. 750 (1884). Leading questions are not prohibited by the Wisconsin rules of evidence but should be avoided. Sec. 906.11(3), Stats. provides that "Leading questions should

not be used on the direct examination of a witness except as may be necessary to develop his testimony."

Sarinske asserts that the following question asked by the state of Dodd on direct examination was improper. "Did he [defendant] indicate to you whether he believed that the person that was shot was dead?" Although the question itself is not leading because it does not give the impression that the questioner desires one answer or another, Sarinske's objection is that the question is leading in the context of the previous questioning. Dodd had been asked several questions and had responded twice that Sarinske said that he had killed the man, and once that Sarinske knew Paulie was dead. Dodd answered this time as follows:

"He says that—before he told me, he says he's been out there for about an hour, he says he'd better be, he's been out there for an hour."

In prior testimony Dodd had never indicated that Sarinske had said "he'd better be [dead]," a statement which in this context is clearly indicative of intent to kill. The state argues that the testimony was "simply cumulative," but it is the only direct evidence of intent in the record. Sarinske argues that the question by the district attorney could have served no purpose but to elicit this particular answer. It is a matter for the judicial discretion of the trial court to determine whether the question is truly leading and suggestive and whether the circumstances justify a leading and suggestive question. Judicial Council Committee's Note, sec. 906.11(3), Wis. Rules of Evidence, 59 Wis.2d R191. We cannot conclude from the record before us that the trial court abused its discretion in allowing this question.

Sarinske also asserts that the state's posing the following question on redirect of the pathologist was im-

proper: "Is it your considered opinion, Doctor, that the entrance or the path that the projectory took was on a more or less a level path." This question is clearly leading, yet it was defense counsel who placed in issue the angle of entry of the shotgun blast. Because the subject matter had already been testified to on direct examination and cross-examination, it was not an abuse of discretion for the trial court to conclude that the state's question was necessary on redirect to develop the witness' testimony which defense had sought to shake. Sec. 906.-11(3), Stats.

## IV.

Sarinske also argues that the second part of the bifurcated trial relating to the plea of not guilty by reason of mental disease was subject to numerous errors calling for reversal.

## A.

First we turn to the defendant's assertion that the trial court erred in denying his motion to set aside the jury's verdict that he was not suffering from mental disease.

On a plea of not guilty by reason of mental disease or defect, the accused has the burden of proving to a reasonable certainty by the greater weight of the credible evidence that as a result of a mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. Sec. 971.15, Stats.[10] This

---

[10] Sec. 971.15, Stats., provides:

"**Mental responsibility of defendant.** (1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacked substantial capacity either to appreciate the wrongfulness of his conduct or conform his conduct to the requirements of law.

court has held that it is the responsibility of the trier of fact to determine the weight and credibility of the testimony on the issue of insanity and to determine whether the accused has met the burden of proving he was insane. The opinion of an expert even if uncontradicted need not be accepted by the jury. The question of whether an accused has or has not met this burden is one of fact, not one of law for this court on appeal. Where there is sufficient credible evidence to support the jury's finding, the jury's verdict will not be upset. *State v. Bergenthal,* 47 Wis.2d 668, 685, 178 N.W.2d 16 (1970), *cert. denied,* 402 U.S. 972 (1971), *Pautz v. State,* 64 Wis. 2d 469, 475–476, 219 N.W.2d 327 (1974).

The expert witnesses called by the defendant, relying entirely on information supplied by the defendant, testified unequivocally that Sarinske lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law by reason of his affliction with a mental disease known as dissociative reaction. The state's expert testified that the defendant lacked control of his conduct but characterized the cause as emotional distress. The state's expert affirmatively testified that the defendant was not, in his medical opinion, suffering from a mental disease or defect.

As the court in *Pautz v. State,* 64 Wis.2d 469, 219 N.W.2d 327 (1974), noted, the jury is free to disbelieve the defense witnesses entirely, and even if the state declines, as it did in *Pautz,* to present any experts in rebuttal, the accused may fail to satisfy his burden of affirmatively proving that he was suffering from mental

"(2) As used in this chapter, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

"(3) Mental disease or defect excluding responsibility is an affirmative defense which the defendant must establish to a reasonable certainty by the greater weight of the credible evidence."

disease. *State v. Bergenthal,* 47 Wis.2d 668, 178 N.W.2d 16 (1970). Because the defense doctors relied substantially on information provided by Sarinske, the basis of their opinion and their diagnoses could be questioned by the jury on this ground alone. *Pautz v. State, supra,* 64 Wis.2d at 476, 477.

In light of the record, it cannot be said that the jury's finding that the defendant did not meet his burden of proof must be set aside.

Sarinske relies particularly on *Kemp v. State,* 61 Wis. 2d 125, 211 N.W.2d 793 (1973), in which this court in the interest of justice granted a new trial on the issue of mental responsibility.[11] In *Kemp* the jury found Kemp not to be suffering from mental disease. In that case none of the six psychiatrists testified that Kemp was *not* suffering from a mental disease. Three testified that Kemp was suffering from a mental disease; two would not express an opinion; a third said it was conceivable that he was legally insane at the time of the offense. The undisputed evidence was that for at least four years prior to the offense Kemp was experiencing mental or emotional problems. We said in *Kemp* that "considering the evidence as a whole, we conclude it predominates quite heavily on the side of the defendant on the issue of his mental responsibility that justice has miscarried and believe that a new trial will probably bring a different result." *Id.* at 138.

The facts in the case at bar are appreciably different from those in *Kemp*. Prior to the shooting Sarinske, unlike Kemp, had no history of mental or emotional difficulties. One doctor in the instant case testified unequivocally that Sarinske was *not* suffering from a mental disease or defect. We do not believe this case is an appro-

[11] Sec. 251.09, Stats., now sec. 751.06, Stats., quoted at p. 58 *infra.*

priate one for this court to exercise its discretion to reverse the jury's finding.

### B.

Sarinske argues that the verdict submitted to the jury with respect to his plea of not guilty by reason of mental disease or defect was erroneous in form and substance. The trial court submitted a verdict which consisted of a question inquiring: "Is the defendant, Roger Sarinske, not guilty by reason of mental disease?"[12] The defendant urged the court to use the following language:

"Did the Defendant, Roger Sarinske, at the time of the commission of the murder of Paul Paulie on March 3, 1976, have a mental disease so as to lack substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

The defendant contends that his form of a factual question avoids the possibility of what might be considered inconsistent verdicts by the jury—first a finding of guilty and then a finding of not guilty. He further contends that his suggested form is the correct statement of the burden of proof and the legal standard and that the submitted verdict deprived him of having the correct statement of the issue go to the jury.

Although we said in *State ex rel. La Follette v. Raskin,* 34 Wis.2d 607, 627, 150 N.W.2d 318 (1967), that "the issue should not be submitted to the jury in terms of 'guilty' or 'not guilty by reason of insanity' but as a factual question whether the defendant was insane at the time he committed the act," we conclude that the question posed in the case at bar is proper and does not con-

---

[12] The form of the verdict is in accord with Wis J. I.—Criminal 600A–CPC.

stitute error. The verdict does not play the focal role in a criminal trial which the defense assigns it. The standard verdict for criminal juries simply asks whether the accused is guilty of the named crime; it does not recite the elements of the crime or detail presumptions or burdens of proof.

The verdict in the instant case is sufficient since it decides the question in issue in such a way as to enable the court intelligently to base judgment thereon. *Peters v. State*, 42 Wis.2d 541, 547, 167 N.W.2d 250 (1969). The jury was instructed as to the meaning of the plea, as to the meaning of "mental disease" as used in the law and as to the defendant's burden of proof to be entitled to a verdict which absolved him of legal responsibility for the killing.[13] Neither party objects to the instructions on appeal. We therefore conclude that the defendant was not harmed in any manner by the form of the verdict.

## C.

Sarinske objected to the state's calling Dr. Leigh Roberts as a witness and the trial court's giving the absent

---

[13] The instructions in part stated:

"A person is not responsible for his criminal conduct if, at the time of such conduct, he had a mental disease so as to lack substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. By his plea of not guilty by reason of mental disease, the Defendant claims that, at the time of the commission of the crime, he had such a mental disease so as to lack substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law so that he was not responsible for his criminal conduct. The State, however, denies the defendant was suffering from such a mental disease at the time of the commission of the crime, and the State thereby claims that he is criminally responsible for such crime.

"A person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."

witness instruction in relation to Sarinske's failure to call Roberts. Dr. Roberts had examined Sarinske, at defense counsel's request, and had subsequently recommended that defense consult Dr. Lorenz. Defense argues that the calling of Roberts and the absent witness instruction prejudiced Sarinske in that the jury was left with the impression that, had the doctor testified further, the testimony would have been unfavorable to the defendant. We conclude that while the court erred in allowing Dr. Roberts to testify and in giving the absent witness instruction, the error was not prejudicial to warrant reversal.

The trial transcript shows that the defense objected in chambers to Dr. Roberts testifying, and in the courtroom the defense centered on the requirement of sec. 971.16 (3), Stats., that opposing counsel be given a written report of the physician's examination of Sarinske three days before trial.[14] The trial court permitted Roberts to

---

[14] Sec. 971.16(3), Stats.:

"(3) Whenever the defendant wishes to be examined by a physician or other expert of his own choice, the examiner shall be permitted to have reasonable access to the defendant for the purposes of examination. No testimony regarding the mental condition of the defendant shall be received from a physician or expert witness summoned by the defendant unless not less than 3 days before trial a report of the examination has been transmitted to the district attorney and unless the prosecution has been afforded an opportunity to examine and observe the defendant if such opportunity has been seasonably demanded. The state may summon a physician or other expert to testify, but such witness shall not give testimony unless not less than 3 days before trial a written report of his examination of the defendant has been transmitted to counsel for the defendant."

We need not decide whether sec. 971.16(3), Stats., prohibits the state from calling Dr. Roberts, without the submission of a written report three days prior to trial, when the state calls the defendant's medical expert or when, as the state claims here, it seeks only to establish the fact of consultation, not the text of the report. The harm, if any, to the defendant from Robert's taking the stand arises from the inference that Roberts' testimony would have been unfavorable to Sarinske.

take the stand and to testify about his qualifications and to describe the events leading to his examination of Sarinske. When the state asked Dr. Roberts whether Sarinske revealed any of the details of the events of March 2–3, Roberts asked the court whether "the confidential [doctor-patient] relationship applies to this specific question." The trial court then indicated that for the reasons alluded to by Roberts and for the reason cited by defense counsel, namely "sec. 971.16(1) [sic] of the Wisconsin Statutes and the last sentence thereof," he would sustain the defense objection. (From the context of the transcript it is clear the trial court meant sec. 971.16(3).)

The instruction given, over defense counsel's objection, contains the rationale for allowing the jury to know that a witness could have been but was not called and that an inference adverse to the defendant could be drawn from the fact.

"You are instructed that if a party fails to call a material witness within his control or whom it would be more natural for that party to call than the opposing party and the party fails to give a satisfactory explanation for his failure to call the witness, then you may infer that the evidence he would give would be unfavorable to the party failing to call him."

■

We have said that the absent material witness instruction should be "narrowly construed to be applicable only to those cases where the failure to call a witness leads to a reasonable conclusion that the party is unwilling to allow the jury to have the full truth." *Ballard v. Lumbermens Mut. Cas. Co.*, 33 Wis.2d 601, 615–16, 148 N.W.2d 65 (1967).

■

The failure of a party to call a witness under its control is probative only if the opposing party has made "a showing that there is a reasonable relationship between the failure to produce the witness and the inference that the testimony, had it been placed before the

jury, would have been unfavorable to the party's cause. *Featherly v. Continental Insurance Co.,* 73 Wis.2d 273, 282, 243 N.W.2d 806 (1976). *See also, Karl v. Employers Ins. of Wausau,* 78 Wis.2d 284, 301, 254 N.W.2d 255 (1977). It is the establishment of the reasonableness of this inference which controls whether testimony relating to the absent witness and the instructions are proper.

In *Feldstein v. Harrington,* 4 Wis.2d 380, 90 N.W.2d 566 (1958), the trial court refused to allow plaintiff to testify that he had been examined by a physician at the request of the defendant; the defendant did not call the physician as a witness. The trial court also refused to permit plaintiff's counsel in his argument to the jury to comment on the failure of the defendant to call the doctor as a witness. This court held that the trial court committed error. We held that the failure of the defense in a personal injury action to call as a witness the physician who had examined the plaintiff at defense's request was sufficient to sustain the inference that the testimony would have been unfavorable to the defense. Given the situation of the case, the court concluded, it would have been more natural for the defense to call the witness than to decline to do so. In contrast, the court in *Ballard, supra,* found that plaintiff's failure to call its own third expert witness, a chiropractor, when it had already called two physicians as expert witnesses, did not give rise to the inference that the testimony of the uncalled third witness would have been damaging to their case.

In the case at hand, the use of two experts by the defense could well have made the testimony of the third expert, Dr. Roberts, cumulative and superfluous. The state made no showing of the reasonable relation between the failure to produce Dr. Roberts and the unfavorable inference. As we have said, a party need not call every possible witness lest his failure to do so will result in an

inference against him. *Valiga v. National Food Co.,* 58 Wis.2d 232, 246, 206 N.W.2d 377 (1973). If we narrowly construe the use of the absent witness instruction we would conclude that on the basis of this record the giving of the instruction was error.

The issue then is whether the error, if any, requires reversal. In the instant case we conclude that any error was harmless whatever formulation of the harmless error rule is used. *Kelly v. State,* 75 Wis.2d 303, 317, n. 3, 249 N.W.2d 800 (1977). We do not believe the error influenced the jury or if it did the effect was slight. On the record, it cannot reasonably be said that had error not been committed, the verdict might probably have been different. Sec. 817.37, Stats.;[15] *Claybrooks v. State,* 50 Wis.2d 79, 86, 183 N.W.2d 139 (1971); *Wold v. State,* 57 Wis.2d 344, 356, 204 N.W.2d 482 (1973); *State v. Courtney,* 74 Wis.2d 705, 716, 247 N.W.2d 714 (1976). In the framework of the instant case, there is no significant possibility that the defendant would have been found not guilty by reason of mental defect in the absence of the error.

## D.

Sarinske argues that the trial court erred, and independently, abused its discretion in permitting the second part of the case to proceed at a time when the defendant

---

[15] Sec. 817.37, Stats. 1975, provides:

"**Judgments; application to reverse or set aside; new trial; reversible errors.** No judgment shall be reversed or set aside or new trial granted in any action or proceeding, civil or criminal, on the ground of misdirection of the jury, or the improper admission of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court to which the application is made, after an examination of the entire action or proceeding, it shall appear that the error complained of has affected the substantial rights of the party seeking to reverse or set aside the judgment, or to secure the new trial."

was physically and mentally unable to cooperate and participate in his own defense.

The testimony was closed Wednesday evening, and it was agreed that the case would be submitted to the jury the following morning. The trial court was advised Thursday morning that Sarinske had taken an excess amount of sedatives requiring his stomach to be pumped and that he could not return to court for at least twenty-four hours. Sec. 971.04(3), Stats., provides that a trial shall not be postponed if the accused voluntarily absents himself without leave of the court.[16] The trial court held a hearing to determine whether the attempted suicide was a voluntary act. Notwithstanding its finding that Sarinske absented himself voluntarily, the trial court acceded to the state's recommendation for an adjournment on the ground of Sarinske's absence.

Defense counsel argues on appeal that the twenty-four hour adjournment was not adequate and that when the trial resumed on Friday, Sarinske, although present, was still suffering from the ill effects of his attempted suicide. Counsel asserts that Sarinske's being physically

---

[16] Sec. 971.04(3), Stats., provides:

"(3) If the defendant is present at the beginning of the trial and shall thereafter, during the progress of the trial or before the verdict of the jury has been returned into court, voluntarily absent himself from the presence of the court without leave of the court, the trial or return of verdict of the jury in the case shall not thereby be postponed or delayed, but the trial or submission of said case to the jury for verdict and the return of verdict thereon, if required, shall proceed in all respects as though the defendant were present in court at all times. A defendant need not be present at the pronouncement or entry of an order granting or denying relief under s. 974.02 or 974.06. If he is not present, the time for appeal from any order under ss. 974.02 and 974.06 shall commence after either a copy has been served upon him or upon his attorney, if any. Service on the defendant may be made in the manner provided for service in civil actions or by mailing a copy to the defendant's last-known address or under s. 53.02(5), if applicable."

present but mentally incapacitated cannot be said to constitute the "presence" to which he is entitled. Sarinske argues in effect that an accused has a constitutional right to be present in the courtroom at every stage of his trial. *Illinois v. Allen,* 397 U.S. 337, 338 (1970); *Leroux v. State,* 58 Wis.2d 671, 689, 207 N.W.2d 589 (1973), Sec. 971.04, Stats.

We hold that the defendant was present and that the trial court did not abuse its discretion in proceeding with the trial. The record does not substantiate counsel's contention that the defendant was stuporous and indifferent when the trial resumed. Counsel did not request the trial court to view the defendant or to take testimony as to the defendant's competence. There was no medical or other testimony to prove that Sarinske was unfit to proceed with the trial. The record shows that the defendant was released from the hospital to attend the trial. The record shows that on Thursday the trial court and both counsel had been advised by doctors that Sarinske would be able to be in court in twenty-four hours. The only matters remaining were the presentation of closing arguments of counsel, the court's instructions to the jury and the jury's rendition of its verdict, matters in which an accused normally does not actively participate.[17] The jury had heard the testimony, the jury had been sequestered, the instructions had been discussed with counsel. Further delay would apparently have caused inconvenience. There is not sufficient reliable information in the record in the instant case for us to conclude that the defendant was in such a condition that he was not competent to proceed with the remain-

---

[17] We do not mean to imply that we view as insignificant that the accused hear and see the proceedings, can be seen by the jury and can participate in his rights at this stage. *Bustamante v. Eyman,* 456 F.2d 269, 274 (9th Cir. 1972); *State v. Okumura,* 570 P.2d 848, 851 (Haw. 1977); sec. 971.04, Stats.

ing part of the trial. On the basis of this record we find no error or abuse of discretion in the trial court continuing with the proceeding. *Cf. Nadolinski v. State,* 46 Wis.2d 259, 268, 269, 174 N.W.2d 483 (1970); sec. 971.-14, Stats.

## V.

Sarinske concludes his argument by asking for a new trial in the interest of justice.

Sec. 751.06, Stats., provides:

**"Discretionary reversal.** In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice."

Sarinske's chief argument is that a new trial in the interest of justice is required because the jury was not given the option of considering a verdict of manslaughter under sec. 940.05(1), Stats. The defendant's brief concedes he has no right to a new trial on this ground because no request for an instruction of manslaughter had been made by defense counsel. The brief explains that the defendant had not authorized defense counsel to make such a request. Indeed the trial court suggested the submission to the jury of instructions relating to manslaughter or second-degree murder. The defendant did not wish these instructions given. Sarinske's brief seeks the exercise of the court's discretionary power under sec. 751.06, Stats., to grant a new trial in the interest of

justice which is not dependent on the aggrieved party's preserving his objections in the trial court.

Sarinske contends that the evidence adduced at the trial, including evidence of the relationship between the deceased and defendant's wife, the defendant's knowledge of such relationship, the defendant's emotional and mental state upon concluding that the deceased and his wife were in each other's presence notwithstanding the promise of each of them to terminate their relationship, and the deceased's presence with defendant's wife at the Sarinske residence, may have led the jury, if properly instructed, to the conclusion that the killing, if done by the defendant, was manslaughter rather than murder.

In his reply brief and in his written submission prior to oral argument, Sarinske, relying on *Hughes v. Mathews,* 576 F.2d 1250 (7th Cir. 1978) and *Schimmel v. State,* 84 Wis.2d 287, 267 N.W.2d 271 (1978) (which cases were decided after the trial and appeal of the instant case), argues that he could have introduced proof in the first part of the trial to establish that he did not possess the capacity to form the specific intent required as an element of first-degree murder.

However, Sarinske did not proceed at trial on the theory that he lacked the requisite intent to be found guilty of first-degree murder. The theory of his defense was to raise a reasonable doubt that someone else committed the act. On the issue of guilt Sarinske asserted that he did not know whether he did the killing. Sarinske deliberately refused the opportunity to submit to the jury instructions to enable it to find him guilty of second-degree murder or manslaughter, crimes which differ from murder in the element of intent. On appeal Sarinske is attempting to substitute a theory of trial defense different from the position upon which he elected to rely during trial. *Cf. State v. Hebard,* 50 Wis.2d 408, 417, 184 N.W.2d 156 (1971).

This court has said that sec. 751.06, Stats., granting it the power of discretionary reversal, was not intended to allow a party to try a case on one theory and losing on that theory to have a second trial on a different, valid theory. "When there are alternative causes of action and one makes a choice, there is little room for arguing the real issue has not been tried." *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis.2d 402, 408, 198 N.W.2d 363 (1972). *See also Sutter v. State,* 69 Wis.2d 709, 719, 233 N.W.2d 391 (1975) ; *State v. Anderson,* 51 Wis.2d 557, 564, 187 N.W.2d 335 (1971) ; *United States v. Novak,* 455 F.2d 921 (3d Cir. 1972).

As discussed previously, the evidence was sufficient to support the jury's finding that the defendant was guilty of first-degree murder beyond a reasonable doubt and that the defendant was not suffering from a mental disease or defect at the time of the murder. Looking at the entire record in this case, we cannot conclude that justice has miscarried.

*By the Court.*—Judgment and order affirmed.