STATE of Wisconsin, Plaintiff-Respondent,

v.

Earl L. MURDOCK, Defendant-Appellant.

Court of Appeals

*No. 99–0566–CR. Submitted on briefs February 11, 2000.—Decided July 20, 2000.*

**2000 WI App 170**

(Also reported in 617 N.W.2d 175.)

302

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Donna L. Hintze*, assistant state public defender.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Michael R. Kloss*, assistant attorney general.

Before Dykman, P.J., Vergeront and Deininger, JJ.

¶ 1. DYKMAN, P.J. Earl L. Murdock appeals from a judgment convicting him of first-degree intentional homicide, two counts of attempted first-degree intentional homicide, criminal trespass to a dwelling and disorderly conduct, all while armed with a danger-

ous weapon. Murdock initially entered pleas of not guilty and not guilty by reason of mental disease or defect. After he later pleaded no contest to the criminal charges, a jury rejected Murdock's plea of not guilty by reason of mental disease or defect.

¶ 2. Murdock argues that the trial court erred by concluding that he could not waive a jury in the mental responsibility phase of the bifurcated trial without the consent of the State. We disagree and affirm. However, Murdock also contends that he is entitled to a new trial in the interests of justice on the issue of his mental responsibility because there is a substantial probability that a new trial would produce a different result. Considering the evidence as a whole, we agree. Therefore, we grant a discretionary reversal under WIS. STAT. § 752.35 (1997–98)[1] and remand with directions to conduct a new trial on the issue of Murdock's mental responsibility.

## I. Background

¶ 3. In the information, Murdock was charged with first-degree reckless homicide, two counts of attempted first-degree intentional homicide, criminal trespass to a dwelling and disorderly conduct, all while armed with a dangerous weapon. The charges arose from an April 22, 1997 rampage which began when Murdock argued with his wife in their home and threatened members of his family with a knife. Murdock then went outside and stabbed a neighbor to death. Finally, he forced his way into the home of two other neighbors and stabbed both of them causing serious injuries. Murdock initially entered pleas of not

---

[1] All references to the Wisconsin Statutes are to the 1997–98 version unless otherwise noted.

guilty and not guilty by reason of mental disease or defect.

¶ 4. The State filed an amended information, replacing the charge of first-degree reckless homicide with a charge of first-degree intentional homicide. Murdock again entered pleas of not guilty and not guilty by reason of mental disease or defect to the amended information. Murdock also indicated that he wanted to have a trial to the court instead of a jury on both the guilt and the responsibility phases of the bifurcated trial, but the State was not willing to consent to the jury waiver under WIS. STAT. § 972.02(1).[2] Murdock then filed a motion to compel jury waiver, arguing that § 972.02(1) did not apply to the responsibility phase of a bifurcated trial because the responsibility phase was not criminal in nature. Before the trial court decided his motion, Murdock entered no contest pleas to the five criminal charges. The court found Murdock guilty of the charges in the amended information, but stayed entry of the judgment of conviction until completion of the responsibility phase. The court later denied Murdock's motion to compel jury waiver, concluding that consent of the state was required to waive a jury in the responsibility phase under § 972.02(1).

¶ 5. Beginning on January 20, 1998, the trial court held a three-day jury trial on the issue of Murdock's mental responsibility. After the opening statements, the court read a set of stipulated facts to

---

[2] WISCONSIN STAT. § 972.02(1) (emphasis added) provides:

Except as otherwise provided in this chapter, criminal cases shall be tried by a jury selected as prescribed in s. 805.08, unless the defendant waives a jury in writing or by statement in open court or under s. 967.08(2)(b), on the record, with the approval of the court *and the consent of the state.*

the jury. The court stated that Murdock's wife had known him for twenty years before the stabbings, and that, for nineteen of those years, Murdock had been taking medication for mental health problems. On April 22, 1997, Murdock had not been taking his medication and, when his wife returned home in the evening, they began arguing. During the arguments, Murdock would retreat to his room and come back out, holding his head and stating: "They won. They won." In one of his trips into his room, he picked up a knife. He told his wife: "I'm going to have to hurt somebody. . . . Today was a really bad day. I'm going to have to hurt somebody." Murdock began waving the knife around and threatening his family, including two young children, with it. Murdock's family ran from their apartment to a neighbor's downstairs apartment. Murdock followed his family downstairs and demanded that they come out from hiding. When they did not, Murdock left.

¶ 6.    In the meantime, Norbert Grams, Jr., had left home to get a pack of cigarettes. The next anyone saw of Murdock, he had parked Grams's station wagon in front of Shirley and Edwin Smith's house and was dragging Grams's body from the back seat of the car. Murdock had stabbed Grams approximately twenty times. Grams was still alive when Murdock pulled him from the car. He tried to crawl away, but died shortly thereafter. Murdock then forced his way into the Smiths' house and demanded money. Shirley Smith told the police that Murdock "went berserk stabbing" the Smiths. When she dialed 911, Murdock knocked the phone from her hand, but the police quickly arrived.

¶ 7.    After the trial court read the stipulated facts, two medical experts testified: Dr. Smail, a court-

appointed psychologist, and Dr. Palermo, a psychiatrist hired by the defense. Smail concluded that Murdock suffered from a schizoaffective disorder that caused him to lack substantial capacity to appreciate the wrongfulness of his acts and to conform his behavior to the requirements of the law. Smail stated that he believed that Murdock was in an agitated psychotic state throughout the incidents on April 22, 1997, even though he behaved normally at several points. Smail based his conclusion on an interview with Murdock, on the criminal complaint and police reports, and on Murdock's mental health records for the ten to twelve years prior to the incident that were provided by the defense.

¶ 8.   Smail also explained that after Murdock was arrested and brought to jail, he was seen by a doctor who classified Murdock as being psychotic and prescribed psychotropic medication. On April 24, 1997, Murdock was in such an agitated psychotic state that he was placed in leather restraints. Smail acknowledged that Murdock's mental health history included drug and alcohol abuse. However, he pointed out that there was no evidence that Murdock had used drugs on April 22, 1997. In addition, although Murdock had some alcohol earlier in the day on April 22, the police reports gave no indication that Murdock was intoxicated, and Murdock's recovery from his agitated state took much longer than it should have if it was caused by intoxication. Finally, Smail stated that he did not think that Murdock was malingering, but instead was genuinely mentally ill.

¶ 9.   Dr. Palermo also testified that, at the time of the offenses, Murdock did not have the mental capacity to distinguish right from wrong, to appreciate the nature of his actions, and to conform to the requirements of the law. He stated that Murdock was

suffering from schizophrenia, paranoid/catatonic type, with occasional destructive homicidal excitement. Palermo based his conclusions on an interview with Murdock, and a review of the police reports, county jail records, and the medical history documents provided by the defense. Palermo said that, at the time Murdock demanded money from the Smiths, he knew he had done something wrong and wanted to run away. However, Palermo said such behavior was consistent with his conclusion regarding Murdock's mental state because a person in Murdock's state could be temporarily shocked back into reality by the realization of what he or she had done. Palermo ruled out alcohol use as the cause of Murdock's behavior because Murdock had only had alcohol in the morning before his rampage. Palermo also explained that he ruled out use of drugs, such as angel dust, that might cause strange behavior, because such drugs would cause effects for thirteen or fourteen hours and then be washed out of a person's system, which was not consistent with Murdock's behavior.

¶ 10.   Murdock's mother and brother also testified. Murdock's mother said that she remembered him having mental health problems since 1983. She described a time in 1986 when Murdock came to visit her. He kicked down her door with a wild look in his eyes. Without saying anything he went straight to her kitchen, found a hammer and attacked her with it. Her boyfriend tackled Murdock, but Murdock began choking him until Murdock's mother was able to grab the hammer and knock Murdock out with it. Murdock's mother and her boyfriend ran, but Murdock quickly caught up with them after waking up and asked his mother, "Mama, who is behind you. Who's hurting you?" Murdock's mother said that he was hospitalized

after the incident. She also said that Murdock had come to visit her in Chicago on April 21, 1997, with a strange look in his eyes, but would not respond to her questions and quickly turned around and left. Murdock's brother testified that he was also at his mother's house when Murdock visited on April 21. He said that Murdock had a weird stare, but that he did not think Murdock was under the influence of drugs or alcohol at the time.

¶ 11. Edwin Smith also testified. Smith described the night that Murdock attacked him and his wife. Smith said that, before the attack, he had had little interaction with Murdock, but had no personal disagreements with him. Smith also stated that any time he saw Murdock outside, Murdock had a can of beer in his hand.

¶ 12. Finally, three police officers testified. Officer Santiago, a plain-clothes officer, explained that he was the first to arrive on the scene of the stabbings. He found Murdock sitting on the Smiths' front steps near Grams's dead body. When he saw that Murdock had a knife, Santiago drew his gun and asked Murdock to drop the knife. Murdock refused and Santiago tried to negotiate with him. When uniformed officers arrived, Murdock stood up and sat down several times. He then ran up to the top of the Smiths' porch and came back and sat down several times. Eventually, Murdock ran into the Smiths' house, but soon came back outside again. When Murdock ran back into the house again, Santiago tried to negotiate with him through the closed door. When Murdock finally opened the door, Santiago and several other officers pushed their way into the house, and Murdock ran to the basement.

¶ 13. Detective Schuster testified that he arrived on the scene after Santiago. Schuster and another

officer pried open a basement window in the Smiths' house and waited outside in case they needed to use the window as an alternate entrance to the house. Schuster soon saw Murdock climbing down the stairs into the basement. Schuster told him to stay where he was, but Murdock climbed out the basement window. Schuster then arrested Murdock after subduing him with the help of three or four other officers. Schuster said that Murdock was transported to jail because he did not do or say anything indicating that he should have been transported to a mental health facility.

¶ 14. Detective Koceja testified that he interviewed Murdock once he was in custody. Koceja said that he explained to Murdock what he had been charged with and began to ask him questions. Murdock asked whether he was going to go home that night. Murdock told Koceja that he went crazy, but Koceja said that Murdock did not give any indication during the interview that he should be brought to a mental health facility.

¶ 15. In his closing argument, the district attorney argued that Murdock's history was not one of mental illness, but one of "manipulation and angry, aggressive drug and alcohol abuse." The district attorney argued that the incidents surrounding April 22, 1997, were just another example of Murdock's anger and an attempt by Murdock to escape responsibility for venting his anger. The district attorney pointed out that Drs. Smail and Palermo did not agree on the type of mental disorder from which Murdock suffered. He also pointed out that Palermo indicated that Murdock knew what he was doing. The district attorney argued that the stabbings were not the result of mental illness, but of an irrational display of anger and frustration. He pointed out that Murdock did not actually harm his

family and that his actions were all logical if viewed as part of a criminal outburst of anger. Once Murdock realized he had done something seriously wrong, he began to scheme a way out. The district attorney asserted that all of Murdock's behavior could be explained as resulting from anger and from Murdock's desire to avoid responsibility for his actions. The district attorney told the jury not to be fooled and not to allow Murdock to escape responsibility for his anger one more time.

¶ 16. The jury concluded that Murdock suffered from a mental disease at the time of the crimes, but that he did not lack substantial capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. The trial court denied Murdock's motions for a directed verdict, for judgment notwithstanding the verdict and for a new trial. The court sentenced Murdock to life in prison for the homicide. It imposed concurrent terms of fifteen months for the disorderly conduct, fifteen months for the criminal trespass, and forty years for each of the attempted homicides, all to be served consecutively to the life term. Murdock appeals.

## II. Analysis

### A. Jury Waiver

¶ 17. Murdock argues that the trial court erred in determining that he could not waive a jury in the responsibility phase of the bifurcated trial without the consent of the state. He points out that, in *State v. Koput*, 142 Wis. 2d 370, 395, 418 N.W.2d 804 (1988), the supreme court held that in bifurcated proceedings, "the responsibility phase is not a part of a 'criminal' trial." Since the responsibility phase is not criminal,

Murdock contends that WIS. STAT. § 972.02(1) should not apply.

¶ 18. In order to determine whether the consent of the state is required for a jury waiver in the responsibility phase, we must interpret WIS. STAT. § 972.02(1) and apply it to the statute setting forth the trial procedure when a defendant enters a plea of not guilty by reason of mental disease or defect. The interpretation and application of statutes present questions of law that we review de novo. *See State v. Hughes*, 218 Wis. 2d 538, 543, 582 N.W.2d 49 (Ct. App. 1998). When we interpret a statute, our purpose is to ascertain the intent of the legislature and give it effect. *See State ex rel. Frederick v. McCaughtry*, 173 Wis. 2d 222, 225, 496 N.W.2d 177 (Ct. App. 1992). Our first step is to examine the language of the statute and, absent ambiguity, give the language its ordinary meaning. *See id.* at 225–26. If the language is ambiguous, we examine the scope, history, context, subject matter, and purpose of the statute in order to determine the legislative intent. *See id.* at 226. "Statutory language is ambiguous if reasonable people could disagree as to its meaning." *Id.* Ambiguity can be found in the words of a statutory provision itself, or in the words of the provision "as they interact with and relate to other provisions in the statute and to other statutes." *State v. Sweat*, 208 Wis. 2d 409, 416, 561 N.W.2d 695 (1997).

¶ 19. WISCONSIN STAT. § 972.02(1) unambiguously states that "criminal cases shall be tried by a jury . . . unless the defendant waives a jury . . . with the approval of the court and the consent of the state." However, § 972.02(1) is ambiguous in its interaction with WIS. STAT. § 971.165, the statute setting forth the

trial procedure when a defendant enters a plea of not guilty by reason of mental disease or defect. Section 971.165(1)(a) provides that "[t]here shall be a separation of the issues with a sequential order of proof in a continuous trial. The plea of not guilty shall be determined first and the plea of not guilty by reason of mental disease or defect shall be determined second." Based on that language, it would be reasonable to conclude that the guilt phase and the mental responsibility phase remain a part of a continuous trial such that § 972.02(1) applies to both phases. However, one could reasonably argue that since the issue of criminal guilt is separated from the issue of mental responsibility, § 972.02(1) should apply only to the criminal guilt phase of the trial. Therefore, we must extend our inquiry beyond the language of §§ 972.02(1) and 971.165(1)(a) to determine whether the legislature intended to require the consent of the state for a jury waiver in the responsibility phase of a bifurcated proceeding.

¶ 20. We do not agree that *Koput* establishes that WIS. STAT. § 972.02(1) does not apply to the responsibility phase. In *Koput*, the supreme court held that a unanimous jury verdict was not required on the issue of a defendant's mental responsibility.[3] 142 Wis. 2d at 374. However the court did not clearly establish that the responsibility phase is sufficiently removed from the overall criminal proceedings such that § 972.02(1)

---

[3] *Koput* was based, in part, on WIS. STAT. § 971.175, the statute governing the procedures for a bifurcated trial at the time. 142 Wis. 2d 370, 385, 418 N.W.2d 804 (1988). 1987 Wis. Act 86 repealed § 971.175 and replaced it with WIS. STAT. § 971.165. Section 971.165(2) provides that a jury verdict on the issue of mental responsibility is valid if agreed to by five-sixths of the jurors, as decided in *Koput*, 142 Wis. 2d at 374.

should not apply. The court explained that the phases of a bifurcated trial serve different purposes, as the first phase settles the issue of criminal guilt while the responsibility phase is dispositional in nature. *See id.* at 388–89. However the court also stated:

> Clearly, at one time when the burden of proving sanity was on the state and a unanimous finding of sanity was required, the "proceeding" was criminal. Hence, to some degree, in its ancestry at least, it is not completely divorced jurisgenetically from its antecedents. We, therefore, will not denominate it a civil proceeding. Rather, it is a special proceeding in the dispositional phase of a criminal proceeding—a proceeding that is not criminal in its attributes or purposes.

*Id.* at 397. Upon examining the background of the requirement of state consent for a jury waiver in criminal cases and of the bifurcated trial in Wisconsin, we are not satisfied that the "special proceeding" of the responsibility phase is so divorced from the criminal case that § 972.02(1) does not apply.

¶ 21. The requirement of state consent to a jury waiver in criminal cases was first established in Wisconsin in 1949. *See* Laws of 1949, ch. 631, § 120. The statute providing for state consent was based on Rule 23(a) of the Federal Rules of Criminal Procedure.[4] *See* 1949 S.B. 474 and Senate Amendment 5.[5] Thus, the

---

[4] Federal Rule 23(a) provides: "Trial by jury. Cases required to be tried by jury shall be so tried unless the defendant waives a jury trial in writing with the approval of the court and the consent of the government."

[5] 1949 Senate Bill 474 initially required only the approval of the court, but Amendment 5 added the requirement of the consent of the state.

United States Supreme Court cases addressing the requirement of government consent to jury waiver are instructive regarding the interpretation of WIS. STAT. § 972.02(1). In *Patton v. United States*, 281 U.S. 276, 312 (1930), the Court upheld the power of a criminal defendant to waive a trial by jury, but explained:

> [W]e do not mean to hold that the waiver must be put into effect at all events. That, perhaps, sufficiently appears already. Trial by jury is the normal and, with occasional exceptions, the preferable mode of disposing of issues of fact in criminal cases above the grade of petty offenses. In such cases the value and appropriateness of jury trial have been established by long experience, and are not now to be denied. Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact-finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant.

¶ 22. In *Singer v. United States*, 380 U.S. 24, 26 (1965), the Court upheld the constitutionality of Federal Rule 23(a). The Court further explained the basis for requiring government consent before allowing a criminal defendant to waive a jury:

> A defendant's only constitutional right concerning the method of trial is to an impartial trial by jury. We find no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by

jury—the very thing that the Constitution guarantees him. The Constitution recognizes an adversary system as the proper method of determining guilt, and the Government, as a litigant, has a legitimate interest in seeing that cases in which it believes a conviction is warranted are tried before the tribunal which the Constitution regards as most likely to produce a fair result.

*Id.* at 36.

¶ 23. Wisconsin's system of using a bifurcated trial in cases in which the defendant enters a plea of not guilty by reason of mental disease or defect was developed by the supreme court in 1967. In *State ex rel. La Follette v. Raskin*, 34 Wis. 2d 607, 614, 618, 150 N.W.2d 318 (1967), the supreme court addressed the statute that, at the time, established that pleas of not guilty and pleas of not guilty by reason of insanity were to be tried concurrently and not in a split trial. *See also* WIS. STAT. § 957.11(1) (1967). In order for the statute to comply with due process, the court held that a defendant was entitled to a sequential order of proof on the issues of guilt and insanity in the trial so that inculpatory statements made in a compulsory mental examination would not be disclosed to the jury before it decided the issue of guilt. *See Raskin,* 34 Wis. 2d at 623–27. In 1969, the legislature codified the bifurcated trial procedure established in *Raskin* in WIS. STAT. § 971.175. *See* Laws of 1969, ch. 255, § 63. In 1987, the legislature replaced § 971.175 with WIS. STAT. § 971.165, expanding the rules to be followed in cases where the defendant pleads not guilty by reason of mental disease or defect, but maintaining the basic bifurcated trial procedure with its sequential order of proof as first established in *Raskin. Compare* 1987 Wis. Act 86 *with* WIS. STAT. § 971.175 (1985–86).

¶ 24. In *Koput,* the supreme court explained that Wisconsin's system of having a single, bifurcated trial developed only because the court in *Raskin* was constrained by the then-existing statute requiring a single trial for pleas of not guilty and not guilty by reason of insanity:

> It was only the constraint of the then existing statute that led to the present sequential procedure. *Raskin* clearly states that the issues are independent and should be separately tried. There is no intimation that both issues are to be resolved by criminal trials. Indeed, *Raskin* makes it clear they are not, that each determination is separate and independent. Our present sequential trial is merely a method of insuring due process, while allowing this court in 1967 to adhere to the extent possible to the existing statutory requirement of a unitary trial. But this deference to the legislature, then, should not be construed to mean that both phases are but divisions of a single criminal trial. They are not. *Raskin* makes that clear.

*Koput,* 142 Wis. 2d at 394. While *Koput* suggests that, in Wisconsin, the mental responsibility phase could have evolved as an entirely separate proceeding from the guilt phase, the fact remains that it has not. The statutes governing the procedures for trying pleas of not guilty by reason of mental disease or defect have kept the responsibility phase and guilt phase attached in procedure even as they are detached in nature and purpose. *See id.* at 390.

¶ 25. Considering that the responsibility phase has not been procedurally removed from the criminal proceedings, as *Koput* suggests it could have been, we must examine whether the nature of the decision made in the responsibility phase is such that WIS. STAT.

§ 972.02(1) should not apply. In *Steele v. State*, 97 Wis. 2d 72, 96, 294 N.W.2d 2 (1980), the supreme court explained the nature of that decision:

> Whether or not there should be criminal responsibility is essentially a moral issue. Is it just, in light of the ethics and standards of our society, to hold a person who is insane accountable for what has been done. To make that determination requires no fine tuning. It is, rather, a gross evaluation that a person's conduct and mental state is so beyond the limits of accepted norms that to hold him criminally responsible would be unjust.

¶ 26. Based on the background of WIS. STAT. § 972.02(1) and on the nature of the decision made in the responsibility phase, we conclude that § 972.02(1) applies when a defendant seeks to waive a jury in the responsibility phase of a bifurcated trial. In *Patton*, 281 U.S. at 312, the Supreme Court explained that the requirement of government consent for jury waiver was justified by the historic importance of the jury as fact finder in criminal cases. In *Singer*, 380 U.S. at 36, the Court further explained that, under the Constitution, the jury is the most fair decision maker in criminal cases, and that the government, as a litigant, has a legitimate interest in seeing criminal cases tried before the fairest decisionmaking body. We conclude that the State also has a legitimate interest in having the decision of mental responsibility decided by a jury. In the responsibility phase, the jury is not acting as a fact finder, but as a moral decision maker. It must apply the "ethics and standards of our society" to determine whether a defendant should be held responsible for criminal activity. The State has an interest in seeing that decisions on mental responsibility be in line with the standards of the community, and the views of

a group of jurors are usually more likely to reflect the conscience of their community than the opinion of a single judge. Thus, it is appropriate that a defendant's right to dispense with a jury in the responsibility phase be limited by the requirement of the State's consent.

¶ 27.  We also consider it important that the legislature has not created detached proceedings for the determinations of guilt and mental responsibility, as *Koput* suggests it could have. The statute setting forth the procedures for both the guilt phase and the responsibility phase is a part of the chapter on criminal procedure. *See* WIS. STAT. ch. 971. A defendant can only be found not guilty by reason of mental disease or defect if he or she first admits to criminal conduct or is found guilty. *See* WIS. STAT. §§ 971.06(1)(d) and 971.165(1)(d). Although *Koput* demonstrates that the decision made in the responsibility phase is not criminal in nature, it remains a part of the criminal case in general.

¶ 28.  Murdock argues that, if the jury serves to protect a defendant from the power of the state, the defendant should be able to waive the right to a jury on the issue of mental responsibility without the consent of the state. However, such an argument is equally applicable to the issue of jury waiver on the question of guilt. In *Singer*, 380 U.S. at 36, the Supreme Court held that the government has an interest in having a jury decide the question of guilt, such that the defendant cannot waive a jury without the government's consent. We find Murdock's argument no more persuasive when the jury is to decide the issue of mental responsibility rather than the issue of guilt. Murdock also contends that requiring a jury trial in the responsibility phase only if requested by the defendant would be consistent with the procedure for involuntary com-

mitments in WIS. STAT. § 51.20. However, we do not agree that the procedure followed in cases of civil commitments should bear on the procedure to be followed in criminal cases.

¶ 29. Finally, Murdock asserts that dispositional issues, such as sentencing, have historically been decided by courts, and since the issue of mental responsibility is part of the dispositional phase of a criminal case, it should not be decided by a jury. We disagree. As the supreme court stated in *Koput*, the responsibility phase "is a *special proceeding* in the dispositional phase." 142 Wis. 2d at 397 (emphasis added). As the responsibility phase is a "special proceeding," comparison to other dispositional proceedings is not necessarily helpful. In this case, we have concluded that it is appropriate to require the consent of the state before a defendant can waive a jury on the issue of mental responsibility.

## B. Discretionary Reversal

¶ 30. Murdock argues that we should grant a discretionary reversal in the interests of justice under WIS. STAT. § 752.35,[6] and remand for a new trial in the

---

[6] WISCONSIN STAT. § 752.35 provides:

**Discretionary reversal.** In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

responsibility phase. He contends that justice has miscarried because the jury's verdict in the responsibility phase was against the weight of the evidence presented at trial.

¶ 31. Under WIS. STAT. § 752.35, we may grant a discretionary reversal if the real controversy has not been fully tried or if it is likely for any reason that justice has miscarried. *See State v. Wyss*, 124 Wis. 2d 681, 735, 370 N.W.2d 745 (1985), *overruled on other grounds by State v. Poellinger*, 153 Wis. 2d 493, 451 N.W.2d 752 (1990). In this case, Murdock contends only that justice has miscarried. We may conclude that justice has miscarried if we determine that there is a substantial probability that a new trial would produce a different result. *See State v. Darcy N. K.*, 218 Wis. 2d 640, 667, 581 N.W.2d 567 (Ct. App. 1998).

¶ 32. Four supreme court opinions establish the standards by which we will address Murdock's request for a discretionary reversal. In the first case, *Kemp v. State*, 61 Wis. 2d 125, 138, 211 N.W.2d 793 (1973), the court granted a new trial in the interests of justice on the issue of mental responsibility. In contrast, in *Pautz v. State*, 64 Wis. 2d 469, 479, 219 N.W.2d 327 (1974), *Schultz v. State*, 87 Wis. 2d 167, 172, 274 N.W.2d 614 (1979), and *State v. Sarinske*, 91 Wis. 2d 14, 49–50, 280 N.W.2d 725 (1979), the court upheld the jury or trial court's conclusion that the defendant had not met his burden of proving that he was not guilty by reason of mental disease or defect.

¶ 33. In *Kemp*, 61 Wis. 2d at 134, Donald Kemp was treated intermittently for mental and emotional problems related to his service in Vietnam. One night, while in bed with his wife, Kemp dreamt that he was being attacked by the Viet Cong. *See id.* Kemp slept with a gun under his pillow, and said that he killed

some of the Viet Cong in his dream and was awakened by the gun shots to find his wife next to him. *See id.* The next day, he took his two children to California for three days, and when they returned to Wisconsin, Kemp checked into a hotel instead of returning home. *See id.* at 131–32. Kemp's wife's body was found in their bed in their apartment, with two bullet wounds caused by Kemp's gun. *See id.* at 128–29, 132. When Kemp was informed of his wife's death he appeared emotionally upset, but said that he had no recollection of the past several days. *See id.* at 132.

¶ 34.  Six psychiatrists testified at Kemp's trial. *See id.* at 135. The defense psychiatrist and two court-appointed psychiatrists concluded that Kemp lacked the mental capacity to be held responsible for killing his wife. *See id.* Two psychiatrists hired by the state would not express an opinion. *See id.* A third state psychiatrist testified that Kemp may have lacked capacity, but believed that no one could state for certain whether he lacked capacity because of the variables of alcohol abuse and a possible marital dispute. *See id.* The jury concluded that Kemp did not have a mental disease such that he lacked capacity to be held responsible. *See id.* at 127–28.

¶ 35.  The supreme court granted a new trial in the interests of justice because a new trial would probably result in a different outcome on the issue of mental responsibility. *See id.* at 138. The court concluded that the evidence as a whole predominated heavily on Kemp's side. *See id.* The court acknowledged that Kemp bore the burden of demonstrating lack of capacity, and that the jury was to resolve the credibility of the witnesses and whether Kemp had met his burden. *See id.* at 137. However, the court pointed out that Kemp had a history of mental health difficulties, that

three experts testified that he lacked capacity while no-one unequivocally testified that he did not lack capacity, and that there was no evidence of a marital disagreement before the shooting. *See id.* at 136–38.

¶ 36.  In *Pautz*, 64 Wis. 2d at 471, Dale Pautz, who was then sixteen, stabbed and killed his step-mother and five-year-old stepbrother. At trial, two court-appointed medical experts testified that Pautz lacked capacity to conform his conduct to the require-ments of the law. *See id.* at 473. However, the jury concluded that, while Kemp lacked capacity when he killed his stepbrother, he did not lack capacity when he killed his stepmother. *See id.* at 471.

¶ 37.  The supreme court upheld the verdict, con-cluding that it was reasonable and that there was no need for a new trial in the interests of justice. *See id.* at 479. The court explained that the jury had several grounds on which it could have rejected the expert tes-timony: Pautz provided a detailed confession in which he described how he planned his stepmother's murder; the story Pautz told the medical experts conflicted with the account he gave in his confession; the experts did not examine Pautz until four months after the incident and based their opinions on information provided almost entirely by Pautz; and, Pautz told the experts that he wanted to get off with a light sentence. *See id.* at 476–77. The court also stated that, unlike in *Kemp*: Pautz had no history of mental illness; Pautz's alleged mental disorder did not match the nature of the crime; and, Pautz was able to recall what happened and signed a detailed confession indicating that he intended to kill his stepmother. *See id.* at 479.

¶ 38.  In *Schultz*, 87 Wis. 2d at 170, after Irvin Schultz's wife began divorce proceedings, he visited a psychiatrist who diagnosed him as mentally ill and

placed him on medication. Several months later, Schultz shot and killed his wife. *See id.* At trial, two psychiatrists and one psychologist appeared for the defense and testified that Schultz lacked mental capacity at the time he shot his wife. *See id.* at 170–71. The state presented one psychiatrist, who testified that Schultz exaggerated his mental health problems and did not lack the mental capacity to appreciate what he had done or to conform his behavior to the requirements of law. *See id.* at 171–72. The supreme court upheld the trial court's determination that Schultz should not be relieved of responsibility for shooting his wife. *See id.* at 169. The court pointed out that, unlike in *Kemp*, a medical expert testified that Schultz did not lack mental capacity at the time of the offense. *See id.* at 174.

¶ 39. Finally, in *Sarinske*, 91 Wis. 2d at 24–26, Roger Sarinske shot and killed his wife's lover after finding her with him. At trial, the two medical experts presented by the defense testified that Sarinske lacked mental capacity to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of the law. *See id.* at 48. However, the state's medical expert testified that Sarinske was not suffering from mental disease or defect. *See id.* The supreme court upheld the jury's conclusion that Sarinske did not carry his burden of showing that he lacked capacity to be held responsible. *See id.* at 49. The court explained that the jury was free to disbelieve the defense experts entirely, "and even if the state declines, as it did in *Pautz*, to present any experts in rebuttal, the accused may fail to satisfy his [or her] burden of affirmatively proving that he [or she] was suffering from mental disease." *Id.* at 48–49. The court stated that the defense experts substantially relied on information

provided by Sarinske, and that the jury could question their opinions on that ground alone. *See id.* at 49. Finally, the court pointed out that, unlike in *Kemp*, Sarinske had no history of mental illness and one expert testified that Sarinske did not have a mental disease or defect. *See id.*

¶ 40.  We conclude that we should grant a new trial in the interests of justice on the issue of Murdock's mental responsibility. Considering the evidence presented at trial, there is a substantial probability that a new trial in the responsibility phase would produce a different result. As in *Kemp*, the evidence as a whole predominated heavily on Murdock's side. Like Kemp, Murdock has a history of mental illness, punctuated by at least one other unexplained outburst of violence, as seen in his 1986 attack on his mother, and there was evidence that Murdock had not been taking his medication on the day of the stabbings. The only two medical experts presented at trial testified that Murdock lacked the capacity to appreciate the wrongfulness of his acts and to conform his behavior to the requirements of law. Unlike in *Schultz* and *Sarinske*, there was no conflicting expert testimony. There was also evidence that a third doctor diagnosed Murdock as psychotic and prescribed medication after he was arrested and that, in his second day in jail, Murdock was in such a psychotic state that he was placed in restraints. Murdock's mother and brother testified that Murdock visited them on the day before the stabbings, but had behaved strangely and been unresponsive.

¶ 41.  As in *Pautz*, the jury was free to disbelieve the only two experts who testified and conclude that Murdock did not carry his burden of proof. However, unlike in *Pautz*, the jury in Murdock's case had no basis on which to do so. Although the mental health records

reviewed by Drs. Smail and Palermo were provided by the defense, there was no evidence that those records were inaccurate. In addition, the doctors also based their opinions on police reports, the criminal complaint, jail records and a personal interview with Murdock. Despite the district attorney's assertions in his closing argument, there was no evidence that Murdock was exaggerating his mental illness simply to avoid criminal responsibility. Although he has a history of alcohol use, there was no evidence that Murdock was intoxicated at the time he stabbed Grams and the Smiths.

¶ 42.  The State points out that, unlike in *Kemp*, Murdock was able to recall the incidents leading to his arrest. It argues that Murdock's ability to remember what happened provided a reasonable basis for the jury to reject his assertion that he lacked mental responsibility. We disagree. In *Kemp*, the fact that Kemp did not recall the days surrounding his wife's death was not crucial to the supreme court's decision to grant a new trial in the interests of justice. More important was Kemp's history of mental illness, the fact that no expert contradicted the expert testimony that Kemp lacked capacity, and the lack of evidence of other explanations for Kemp shooting his wife. *See Kemp*, 61 Wis. 2d at 136–38. Considering the evidence as a whole, Murdock's memory of the events did not provide a sufficient basis for the jury to reject his defense of lack of mental capacity.

¶ 43.  Finally, the State contends that a reasonable jury could conclude that Murdock's behavior on April 22, 1997, was purposeful, demonstrating that he understood the wrongfulness of his actions and could have conformed his behavior to the requirements of law. As examples, the State points out that Murdock

tried to prevent Shirley Smith from calling the police and, when the police arrived, Murdock attempted to elude capture. The State argues that, instead of concluding that Murdock was unable to control his violent behavior or to realize its wrongfulness, the jury could have concluded that Murdock stabbed Grams in order to steal his car and then attacked the Smiths in search of money.

¶ 44. We do not agree with the State's characterization of Murdock's behavior. The evidence presented at trial presents no explanation for why Murdock would stab Grams approximately twenty times in order to steal his car, but then park the car in front of the Smiths' house, drag Grams out of the back of the car and leave him in the Smiths' front yard. Although Murdock demanded money from the Smiths, tried to prevent Shirley Smith from calling the police, and fled to the basement when the police came in the house after him, viewed as a whole, his behavior does not appear as purposeful as the State contends. After demanding money from the Smiths, Murdock "went berserk stabbing" them. When the first police officer arrived, Murdock was sitting on the Smiths' front steps near Grams's dead body. Murdock did not try to flee, but instead stood up and sat back down on the steps, and went in and out of the house several times. He even opened the door to the Smiths' house so that the police could come inside. In addition, as Dr. Palermo explained to the jury, the fact that Murdock appeared to be behaving rationally in some instances does not mean that he was generally able to control his behavior or appreciate its wrongfulness.

¶ 45. We need not determine whether a reasonable jury could find that Murdock's behavior was suffi-

ciently rational to conclude that Murdock did not meet his burden of showing a lack of mental capacity. Considering all of the evidence presented at trial, and considering that Murdock's behavior as a whole is not as purposeful as the State contends, we conclude that there is a substantial probability that a new trial would produce a different result.

## III. Conclusion

¶ 46. For the reasons we have discussed, we affirm the trial court's determination that consent of the State is required for a jury waiver in the responsibility phase of a bifurcated trial under WIS. STAT. § 972.02(1). However, under WIS. STAT. § 752.35, we grant a discretionary reversal on the issue of Murdock's mental responsibility because we conclude that it is likely that justice has miscarried. We remand with directions to conduct a new trial only on the issue of Murdock's mental responsibility. *See* WIS. STAT. § 971.165(1)(c)3.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.